**Case No. 16-5722**
**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FOLUSO FAKOREDE,**
        **Plaintiff/Appellant,**

**v.**

**MID-SOUTH HEART CENTER, P.C.,**
        **Defendant/Appellee**

**On appeal from the U.S. District Court of Tennessee, Western District, at Jackson, Tennessee (No. 1:15-cv-01285)**

---

### BRIEF OF APPELLANT, FOLUSO FAKOREDE

---

Donald Capparella, BPR# 011239
Elizabeth Sitgreaves, BPR#27539
Dodson Parker Behm & Capparella, PC
1310 6th Ave North
Nashville, TN 37208
(615) 254-2291
(615) 726-2241 (fax)
Capparella@dodsonparker.com
esitgreaves@dodsonparker.com

## <u>DISCLOSURE OF CORPORATE AFFILIATIONS<br>AND FINANCIAL INTERESTS</u>

Pursuant to 6th Cir. R. 26.1, Foluso Fakorede, makes the following disclosure:

1. Is said party a subsidiary or affiliate of a publicly owned corporation? If yes, list below the identity of the parent corporation or affiliate and the relationship between it and the unnamed party:

    NO

2. Is there a publicly owned corporation, not a party to the appeal that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

    NO

<u>/s/ Donald Capparella</u>                          <u>July 7, 2016</u>
Donald Capparella,                                Date
Counsel for Plaintiff/Appellant

# **TABLE OF CONTENTS**

TABLE OF CONTENTS............................................................. ii

TABLE OF AUTHORITIES ...................................................iv

STATEMENT IN SUPPORT OF ORAL ARGUMENT ..........................1

JURISDICTIONAL STATEMENT ...........................................1

STATEMENT OF THE ISSUES..............................................1

STATEMENT OF THE CASE ................................................2

STATEMENT OF THE FACTS ..............................................6

SUMMARY OF THE ARGUMENT ........................................20

ARGUMENT ....................................................................22

   **A. THIS COURT SHOULD REVERSE THE DISMISSAL OF DR. FAKOREDE's COMPLAINT AS IT SUFFICIENTLY PLEAD A CLAIM FOR RETALIATION**................................................22

     **1. THIS COURT REVIEWS DE NOVO THE DISTRICT COURT'S DISMISSAL OF PLAINTIFF'S COMPLAINT** ..............22

     **2. THE COMPLAIN SUFFICIENTLY PLED A CLAIM FOR RETALIATION UNDER THE FALSE CLAIM ACT**......................23

CONCLUSION ..................................................................43

CERTIFICATE OF COMPLIANCE.........................................44

CERTIFICATE OF SERVICE ...............................................44

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS ..............45

# TABLE OF AUTHORITIES

## Cases:

*Arthurs v. Global  TPA LLC*, No. 6:14-CV-1209-Orl-40TBS, 2015 WL 1349986, at *3 (M.D. Fla. Mar. 25, 2015)................................................................................26

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)..............................................22, 38

*Bonewitz v. NewQuest, LLC*, No. 3:14-CV-00096, 2015 WL 1825375, at *6 (E.D. Tenn. Apr. 22, 2015) ......................................................................................26

*Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 306 (6th Cir. 2012)...............42

*Halasa v. ITT Educ. Services, Inc.*, 690 F.3d 844, 847-48 (7th Cir. 2012).............27

*Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 435–36 (6th Cir. 2009).......................43

*Ickes v. Nexcare Health Systems, LLC*, No. 13-14260, 2016 WL 1275543 (E.D. Mich. Mar. 31, 2016) ................................................................................. 31-32

*Jones-McNamara v. Holzer Health Sys.*, 630 F. App'x 399, 400 (6th Cir. 2015) ..27

*Manfield v. Alutiiq Int'l Solutions, Inc.*, 851 F.Supp.2d 196, 204 (D. Me. 2012)...40

*McKenzie v. BellSouth Telecommunications, Inc.* ("*McKenzie II*"), 219 F.3d 508, 515 (6th Cir. 2000).........................................................................26-27, 32-33, 40

*Merritt v. Mountain Laurel Chalets, Inc.*, 96 F.Supp.3d  801 (E.D. Tenn. 2015) ............................................................................... 22, 27-29, 32

*Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) ............. 41-42

*Mikhaeil v. Walgreens, Inc.*, No. 13-14107, 2015 WL 778179, at *9 (E.D. Mich. Feb. 24, 2015) ................................................................................. 39-42

*Miller v. Abbot  Labratories*, No. 3:14CV-00363-JHM, 2015 WL 3773114, at *5 (W.D. KY June 17, 2015) ........................................................................... 26, 34-36

S*anderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 976 (6th Cir. 2006)
cert denied., 549 U.S. 889 ......................................................................22

*Tibor v. Michigan Orthopaedic Institute*, 72 F.Supp. 3d 750, 754 (E.D. Mich.
2014) ...................................................................................... 27-29, 32

*U.S. ex. rel. Lockyer v. Hawaii Pacific Health*, 490 F.Supp.2d 1062
(D. Hawaii 2007)....................................................................................36

*U.S. ex rel. Marlar v. BWXY Y-12, LLC*, 525 F.3d 439, 449 (6th Cir. 2008)..........23

*U.S. ex. rel. McKenzie v. BellSouth Telecommunications, Inc.*, 123 F.3d 935, 944
(6th Cir. 1997), cert. denied, 522 U.S. 1077) .................................... 26-27

*Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 563 (6th Cir. 2003) ..................22, 39

## **Statutes:**

28 U.S.C. § 1291 ...................................................................................1

28 U.S.C. § 1331 ...................................................................................1

31 U.S.C. § 3720(h)(1).........................................................................26

31 U.S.C. § 3730(h) ....................................................................*passim*

31 U.S.C. § 3732(a) .............................................................................1

42 U.S.C. § 1320a-7b(b) ................................................................1, 23

42 U.S.C. § 1395nn ............................................................................36

42 C.F.R. § 411.357(e)(iii).........................................................9, 24, 29

Federal Rule of Civil Procedure 9(b).......................................................22

Federal Rule of Civil Procedure 12(b)(6) ........................................1, 2, 4

## Statement Requesting Oral Argument

The Plaintiff/Appellant, Dr. Foluso Fakorede, respectfully requests oral argument.  Mr. Fakorede's Complaint alleged a claim for retaliation against him for violation of the False Claims Act, 31 U.S.C. § 3730(h), and the Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).  Plaintiff believes this Court would benefit from the opportunity to pose questions during oral argument due to interest in developing case law in both the district courts and the Courts of Appeal in line with the 2009 amendments to the Federal False Claims Act.  These are also questions related to the Stark Law and how the facts in this case apply to how costs can be improperly allocated to physicians that this Court would benefit from hearing from lawyers in this case.

## Jurisdictional Statement

This Court has jurisdiction over this action, pursuant to 28 U.S.C. § 1291, as this is an appeal from the decision of the United States District Court for the Western District of Tennessee, Eastern Division at Jackson. The District Court for the Western District of Tennessee had jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331.

## I. Statement of the Issues

A.    Whether the district court erred in dismissing Plaintiff Dr. Foluso Fakorede's Complaint for failure to comply with Federal Rule of Civil Procedure 12(b)(6) on

the basis that Plaintiff failed to sufficiently allege protected activity under 31 U.S.C. § 3730(h), where Dr. Fakorede alleged that he raised concerns with his employer about expenses being fraudulently attributed to the cost of his practice, and over $207,000 in these expenses were in fact disallowed as improper?

B.      Whether the district court erred in dismissing Plaintiff Dr. Foluso Fakorede's Complaint for failure to comply with Federal Rule of Civil Procedure 12(b)(6) for failure to adequately plead a causal connection between his protected activity and his termination from Mid-South Heart Center, PC, where the audit that was triggered under the Stark Law by Dr. Fakorede's concerns about fraudulent expenses caused over $207,000 in expenses to be disallowed, and upon learning of the audit triggered by Dr. Fakorede, his employer terminated him.

## II. Statement of the Case

Plaintiff, Dr. Foluso Fakorede ("Dr. Fakorede"), filed this Complaint for retaliation on November 25, 2015, against Defendant Mid-South Heart Center, P.C. ("Mid-South") (Complaint, R.E. 1, PageID#1-21) arising from his termination from employment in violation of the federal False Claims Act ("FCA"), 31 U.S.C. § 3730(h). (Id.). Specifically, Dr. Fakorede alleged that he was terminated from Mid-South after he raised concerns about financial statements submitted by Mid-South to the Jackson-Madison County General Hospital District ("the District"), which fraudulently attributed expenses to Dr. Fakorede in order to obtain greater

2

financial support from the District. (Complaint, R.E. 1, PageID#3, Para. 10, 13, 16).

The relationship between Dr. Fakorede, Mid-South, and the District was a result of a three-party Recruiting Assistance Agreement ("Recruiting Agreement"). (Complaint, R.E. 1, PageID#1). Under the terms of the Recruiting Agreement, Mid-South would employ Dr. Fakorede, a cardiologist, and the District would provide financial support, which included a transition advance, moving expenses, and educational loan repayment. (Complaint, R.E. 1, PageID#1, Para. 4). Additionally, and critical to Dr. Fakorede's claim, the District agreed to provide financial support to supplement Dr. Fakorede's net collections during his first year of practice. (Complaint, R.E. 1, PageID#8-9, Para. 39-43). Dr. Fakorede, in turn, signed over any monthly draws received through this support to Mid-South. (Complaint, R.E. 1, PageID#9, Para. 44-45).

It was the improperly inflated financial statements submitted by Mid-South to support these collection amounts that were called into suspicion by Dr. Fakorede, resulting in his termination. (Complaint, R.E. 1, PageID#11 Para. 56-57; PageID#16, Para. 84-86). Dr. Fakorede had voiced these suspicions due to his concern that he was becoming intertwined in an illegal kickback scheme in violation of the Physician Self-Referral Act, more commonly known as the Stark Law. (Complaint, R.E. 1, PageID#2, Para. 9).

Mid-South filed a Motion to Dismiss Dr. Fakorede's Complaint on January 20, 2016, seeking a dismissal of the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (Motion to Dismiss, R.E. 16, PageID#46). Mid-South argued that Dr. Fakorede failed to allege a plausible FCA retaliation claim under 31 U.S.C. § 3730(h)(1). (Id.). Mid-South argued that the Complaint failed to state a claim that Mid-South retaliated against Dr. Fakorede for engaging in activities in furtherance of either bringing a *qui tam* action under the FCA or attempting to stop a violation of the FCA. (Memo. in Support of Motion to Dismiss, R.E. 17, PageID#48). Mid-South's main argument was that Dr. Fakorede had not plead sufficient allegations to demonstrate that he engaged in protected activity either by filing or pursuing a *qui tam* action or an FCA claim. (Id.).  Mid-South also argued that the Complaint did not allege it had notice of Dr. Fakorede's alleged protected activities, and the allegations in the Complaint did not support a plausible causal link between Dr. Fakorede's termination and his alleged protected activity. (Id. PageID# 49-50).

Dr. Fakorede filed a Response in Opposition to Mid-South's Motion to Dismiss. (Response to Motion to Dismiss, R.E. 25, PageID#122-145). In his Response, Dr. Fakorede demonstrated that Mid-South's argument that he did not engage in protected activity, and that Mid-South was not on notice of this protected activity, relied upon outdated and inapplicable case law. (Id., PageID#136-138).

4

Dr. Fakorede showed that based upon his allegations in his Complaint, his actions were protected activities as defined in 31 U.S.C. § 3730(h) under current case law, and brought to the District's attention Mid-South's inflated expenses. (Response, R.E. 25, PageID#134). Notably, the audit triggered by Dr. Fakorede's suspicions resulted in the District disallowing $314,238.08 of those expenses. (Response, R.E. 25, PageID#125-126, 129, 131, 134).

Dr. Fakorede's allegations in the Complaint also established a clear nexus between Mid-South's termination of him, and his actions challenging Mid-South's use of a recruiting agreement for financial gain as a violation of the FCA related to illegal kickbacks. (*See* Complaint, R.E. 1, PageID#11-18). Dr. Fakorede rebutted Mid-South's argument that it was not on notice of the protected activity, based upon the allegations in the Complaint that the District informed Mid-South that Dr. Fakorede had expressed concern about fraudulently inflated expenses, and that it would disallow $207,000 in expenses submitted by Mid-South and conduct a full audit. (Complaint, R.E. 1, PageID#12, para. 66; PageID#14-15, para. 74, PageID#15, para. 77; Response, R.E. 25, PageID#138-141).

The United States District Court issued an Order on April 26, 2016, granting Mid-South's Motion to Dismiss. (Order Granting Dismissal, R.E. 34, PageID#180-203). The District Court held that the factual allegations in the Complaint of Dr. Fakorede's "request for an audit, urgings to comply with the law and challenges

relative to attribution of certain expenses to him prior to his termination" were insufficient to allege protected activity under 31 U.S.C. § 3730(h). (Id. PageID#201-202). The District Court found that none of these "internal reports" of Dr. Fakorede alleged fraud on the government. (Id.). The District Court also held that Dr. Fakorede did not plead a connection between any protected activity and his termination. (Id.). The Court held that nothing prior to his termination constituted protected activity, and that Dr. Fakorede only communicated his concerns about violations of federal law after his termination. (Id.). Therefore, the Court held that Dr. Fakorede pled no factual allegations from which an inference could be drawn that his termination was in retaliation for protected activity. (Id.). The District Court dismissed the Complaint on the basis that neither direct nor inferential allegations in the Complaint plead the necessary elements for recovery pursuant to 31 U.S.C. § 3730(h). (Id., PageID#203).

The Judgment was entered on May 4, 2016 on the District Court's Order. (Judgment, R.E. 35, PageID#204). Dr. Fakorede filed a timely notice of appeal on May 24, 2016. (Notice of Appeal, R.E. 36, PageID# 205).

### III. Statement of the Facts

This action arose following the wrongful termination of Dr. Foluso Fakorede by Defendant, Mid-South Heart Center, P.C.  Dr. Fakorede was recruited by Mid-South while completing his general cardiology fellowship at Cooper University

6

Hospital, in Camden, New Jersey in the late spring of 2012. (Complaint, R.E. 1, PageID#7, Para. 33-34). Dr. Tommy Miller, a partner at Mid-South, had been an interventional cardiology fellow at Cooper University Hospital while Dr. Fakorede was a medical student, and the two were acquainted. (Id., Para. 34). Mid-South's recruitment of Dr. Fakorede was for a position as an interventional cardiologist in Jackson, Tennessee. (Id.). Following Mid-South's expression of interest in Dr. Fakorede, he spoke with a recruiter from the District, Cheri Spencer, who informed Dr. Fakorede that the Jackson, Tennessee area needed an additional cardiologist, and therefore the District could provide a recruitment package. (Id., Para. 35).

## A. Dr. Fakorede is Hired by Mid-South and Enters into a Recruiting Agreement.

On July 15, 2013, Dr. Fakorede signed a Physician Employment Agreement with Mid-South and the Recruiting Agreement with Mid-South and the District. (Id., Para. 37). These Agreements had commencement dates of November 1, 2013, and in the fall of 2013, Dr. Fakorede and his family moved from New Jersey to Jackson, Tennessee, to begin his cardiology practice. (Complaint, R.E. 1, PageID#8, Para. 38). Under the terms of the Recruiting Agreement, the District advanced certain expenses such as a moving advance, a transition advance, and educational loan repayment to Dr. Fakorede to assist him in establishing his practice in Jackson. (R.E. 1, PageId#8, Para. 39). Dr. Fakorede's obligations under the Recruiting Agreement were to remain in active practice as a cardiologist within

7

the greater Jackson, Tennessee area for at least three years, and to maintain staff privileges at Jackson-Madison County General Hospital for the three-year term of the Agreement. (Complaint, R.E.1, PageID#9, Para. 46).

The Recruiting Agreement also established a Net Collection Support Account for Dr. Fakorede's first year of practice in order to supplement his net collections while working to establish a patient base. (Id., PageID#8, Para. 40). The District agreed to pay the difference between Dr. Fakorede's actual net collections and his incurred expenses during his first year up to $500,000. (Id., Para. 41). To calculate the District's financial responsibility, Dr. Fakorede's gross collections would be reduced by his incurred expenses, and the District would advance Dr. Fakorede the difference. (Id.). As illustrated in the Complaint, if Dr. Fakorede's gross collections were $400,000 during his first year and his incurred expenses were $100,000, then his net collections would be $300,000, and the District would advance him up to $200,000, which was the difference between $300,000 and the $500,000 maximum amount. (Id.).

The incurred expenses used in this formula included "actual direct incremental expenses" attributable to Dr. Fakorede's employment with Mid-South, and it was Mid-South that was required to submit the appropriate financial statements to the District to demonstrate these direct expenses. (Id., Para. 42). The actual direct incremental expenses element in the formula is particularly important

because in order for the Recruiting Agreement to be exempt from Stark Law coverage, it must be structured so that the costs allocated by the physician practice to the recruited physician do not exceed actual additional incremental costs attributable to the recruited physician. (Complaint, R.E. 1, PageID#6-7, Para. 32 (citing 42 C.F.R. § 411.357(e)(iii)).

Mid-South benefitted from the existence of this Net Collection Support Account because it was able to hire Dr. Fakorede into its practice with almost no financial risk. (Id., PageID#9, para. 44). Mid-South would not incur any additional costs so long as the expenses related to the hiring and employing of Dr. Fakorede did not exceed the amount generated by Dr. Fakorede during his first year by more than $500,000. (Id., Para. 44).   If the amount advanced by the District was determined to be more than the permitted amount, the District required that Dr. Fakorede and Mid-South refund the difference within 30 days or interest would be incurred on the overpayment. (Id., Para. 43).  If Dr. Fakorede fulfilled the terms of the Recruiting Agreement, the District would forgive all debt that he had incurred, but if he did not fulfill the obligations, Dr. Fakorede would be obligated to repay all funds advanced by the District immediately. (Id., Para. 47-48).

The advances from the Net Collections Support Account were in the form of quarterly loans. (Complaint, R.E. 1, PageID#10, Para. 51). Dr. Fakorede was required to sign over his monthly draws from the District to Mid-South every time

he received them. (Id., PageID#9, Para. 45). During the first two quarters, Mid-South instructed Dr. Fakorede to take the maximum possible draw from the Net Collections Support Account and a sizeable amount for the last two quarters. (Id.). It was Dr. Fakorede's understanding that Mid-South would be responsible for determining his expenses, calculating the net collections, and repaying the District for any amounts overdrawn from the support account. (R.E. 1, PageID#10, Para. 51). Despite the fact that Dr. Fakorede was making the draws from the account, Mid-South did not provide Dr. Fakorede with any data recording his collections or the expenses that Mid-South was attributing to the establishment of his practice. (R.E. 1, PageID#10, Para. 52).

## B. Dr. Fakorede Raises Concern over Mid-South's Inflated Expenses.

Dr. Fakorede completed his first year with Mid-South on October 31, 2014, with gross collections of $751,221.92. (R.E. 1, PageID#9-10, Para. 49-50). Mid-South was required to submit its year-end financial statement to the District within 30 days of the end of the first-year term, which was November 30, 2014. (R.E. 1, PageID#10, Para. 53). This statement was to provide documentary evidence to the District of Dr. Fakorede's gross collections, and that the expenses declared by Mid-South were the actual direct incremental expenses related to Dr. Fakorede's practice attributable to him. (Id. Emphasis supplied). The District did not provide the financial statement by the required date. (Id.).

On or about December 8, 2014, Dr. Fakorede requested the overdue financial statement from Carla Reeves, the Financial Director for the District, and learned for the first time that Mid-South had not submitted the required year-end financial report. (R.E. 1, PageID#10, para. 54). Dr. Fakorede asked that the records be submitted to him as soon as they were received so that he could review Mid-South's calculations before they were in final form. (Id., PageID#10-11, para. 55). Ms. Reeves did provide Dr. Fakorede with a partial financial statement submitted by Mid-South, dated June 10, 2014, which covered the first two quarters of his term. (Id.).

Dr. Fakorede had never seen this partial financial statement until Ms. Reeves provided it to him---when he reviewed the numbers, Dr. Fakorede became very concerned. (R.E. 1, PageID#11, Para. 55-56). Mid-South had calculated Dr. Fakorede's first quarter net collections as negative $48.26, despite the fact that his gross quarter collections were listed as $99,879.75. (R.E. 1, PageID#11, Para. 56). Mid-South had calculated his second quarter net collections as $6,258.14, despite gross collections of $188,894.41. (R.E. 1, PageID#11, Para. 56). Due to this surprisingly low number for net collections, Dr. Fakorede looked closer at the expenses attributed to him by Mid-South and grew even more concerned. (Id.).

Dr. Fakorede was especially troubled by Mid-South's statement that it attributed $127,000 in "depreciation expense" to him related to equipment

11

purchased, moved, and installed at Mid-South's newly completed out-patient based lab ("OBL"). (R.E. 1, PageID#11, Para. 57). The OBL lab had not been used at all until August 2014, and Dr. Fakorede himself never used the OBL lab until later October, 2014. (Id.). Other expenses that concerned Dr. Fakorede included significant expenses for "salaries and wages (incremental staff)," legal and professional expenses, consulting expenses, and "medical supplies (nuclear & OBL)." (R.E. 1, PageID#11, Para. 58).

Despite several requests, by the end of 2014, Dr. Fakorede had still not received the year-end financial statement from Mid-South. (R.E. 1, PageID#11, para. 59). In early January 2015, Dr. Fakorede emailed Ms. Reeves again to request the financial statement and underlying documentation justifying Mid-South's calculations, and informed her that he wished to review the records with his own accountant. (R.E. 1, PageID#11-12, Para. 60). Dr. Fakorede specifically requested the underlying documentation on January 5, 6, and 8, 2015. (R.E. 1, PageID#12, para. 61). Dr. Fakorede received the year-end financial report on January 9, 2015, but no underlying documentation or data. (R.E. 1, PageID#12, Para. 61).

As with the partial financial statements, Dr. Fakorede was troubled by the year-end report and the expenses that Mid-South was asserting were directly attributable to him, which he believed were not related to his employment. (R.E. 1,

PageID#12, Para. 62). In total, Mid-South was asserting that $588,418.67 in expenses were directly attributable to Dr. Fakorede for his first year of practice. (R.E. 1, PageID#12, Para. 65). These alleged expenses included $207,230.94 for the "depreciation" expense for the OBL lab he did not use; $131,190.04 in medical supplies; and $110,051.52 for salaries and wages for staff. (R.E. 1, PageID#12, Para. 63-64).

## C. After Dr. Fakorede Raises Concerns About Fraud Related to Expenses Attributed to Him, the District Begins to Ask Questions.

On the day that she provided Dr. Fakorede with the year-end financial report, Carla Reeves sent an e-mail to Charlotte Beard, Practice Manager for Mid-South, and Mickey Hannon, Mid-South's outside accountant, informing them that Dr. Fakorede had "raised some questions" and was requesting underlying documentation of the expenses. (R.E. 1, PageID#12, Para. 66). Based on Dr. Fakorede's request, Ms. Reeves asked Mid-South to provide a detailed schedule to support the depreciation calculations. (R.E. 1, PageID#12, Para. 66).

On January 10, 2015, Dr. Fakorede sent an email to Carla Reeves at the District, and Charlotte Beard at Mid-South, and Mickey Hannon, Mid-South's accountant. (R.E. 1, PageID#13, Para. 67). In the email, Dr. Fakorede expressed concerns about the financial report and requested that the District collaborate with Mid-South to revisit the depreciation expense attributed to him and drawn on his loan. (Id.). Specifically, Dr. Fakorede noted that to the best of his knowledge, he

had not used the OBL until October 29, 2014, which was just a few days prior to the end of his first-year term on October 31, 2014. (Id.).

Two days later, on January 12, 2015, Mickey Hannon, Mid-South's outside accountant, responded to Carla Reeves (District) to defend the depreciation expenses attributed to Dr. Fakorede. (Id., Para. 68).  Hannon contended that Mid-South attributed the OBL depreciation expense to Dr. Fakorede because the renovation of the space and the addition of the OBL/vein lab were done in anticipation of hiring a new cardiologist, claiming that it was reasonable to attribute such expenses to Dr. Fakorede. (Id.). Hannon took this position even though he acknowledged that no patients were seen in the OBL until August 2014. (Id.).

### D. Dr. Fakorede Continues His Protected Activity.

Dr. Fakorede was very concerned that Mid-South was deliberately and fraudulently misclassifying its expenses as being related to him in order for the District to pay for these expenses, which would constitute an illegal kickback arrangement. (Id., Para. 69). Dr. Fakorede's concern was not a personal concern because Mid-South indemnified Dr. Fakorede for any overpayment that had to be returned to the District. (R.E. 1, PageID#13-14, para. 70-71). Instead, Dr. Fakorede was concerned for his reputation as a new doctor in the small Jackson, Tennessee market, and believed as a matter of principle that it was not right for Mid-South to

retain several hundred thousand dollars advanced by the District for expenses that were not actually attributable to him, and therefore in violation of the Recruiting Agreement. (R.E. 1, PageID#14, para. 70).

Dr. Fakorede chose to go over Carla Reeves's head and voice his concerns directly to the District's CEO, Bobby Arnold. (R.E. 1, PageID#14, para. 71-72). On January 16, 2015, Dr. Fakorede sent an email to Arnold requesting an independent review by an independent auditor qualified "in health care matters who is familiar with Physician Assistance Agreement and Loan Income Guarantees." (Id., para. 72). Dr. Fakorede informed Arnold that he had requested supporting documentation of the expenses including a depreciation schedule, but had not received anything. (Id.). Dr. Fakorede requested this independent review because of his growing concern by Mid-South's submitted expenses and the apparent lack of concern regarding possible improper expenses by the District. (Id.).

On January 21, 2015, when Dr. Fakorede had received no response from Arnold, he went to see Arnold to raise his concerns in-person. (R.E. 1, PageID#14, para. 73). As Arnold was not in his office, his secretary asked Dr. Fakorede to resend his email and reassured him that she would make sure Arnold received it. (Id.). As of January 30, 2015, Dr. Fakorede had not received a response from Arnold. (Id., para. 74). However, on January 30, Vanessa Patrick, the District's

recruiter, called Dr. Fakorede and informed him that the District had <u>disallowed the $207,230.94 "depreciation expense"</u> for the OBL, an expense Dr. Fakorede had raised concerns about in his communications to the District and Mid-South, including in his January 10th email to Carla Reeves (District), Charlotte Beard (Mid-South's practice manager), and Mickey Hannon (Mid-South's accountant). (R.E. 1, PageID#13, para. 67; PageID#14-15, para. 74).

On February 2, 2015, Dr. Fakorede made another attempt to obtain an appointment with the District's CEO Arnold through his secretary. (R.E. 1, PageID#15, para. 75). As Dr. Fakorede was leaving the District's Administration Office area, he received a text message from the District's Vice-President Deann Montchal, informing him that she had been "in conversation with everyone" and that he should contact her if he had any questions. (R.E. 1, PageID#15, para. 76).

Dr. Fakorede met with VP Montchal after receiving the text message on February 2, 2015. (Id., para. 77-78). VP Montchal informed Dr. Fakorede that she had spoken with Mid-South's CEO Dr. Cunningham on January 30, 2015, and informed him that the District was requesting a refund of the $207,000 identified as a depreciation expense for the OBL. (Id.). Montchal did not directly address any other categories of the expenses claimed by Mid-South that Dr. Fakorede believed were also inflated. (Id.). VP Montchal assured Dr. Fakorede that there would be

transparency going forward and that Dr. Fakorede and the District's CEO could have an in-person meeting in the near future. (Id.).

The following day, VP Montchal sent Dr. Fakorede a text message informing him that the District was requesting a complete line-item audit of Mid-South's financial statement. (Id., para. 79). Dr. Fakorede responded and stated that he was reassured by this decision for the line-item audit. (Id., para. 80). He further reminded Montchal that the Recruiting Agreement, which was signed by himself, the District, and Mid-South, contained express language stating that the Recruiting Agreement was not meant to advance Mid-South's financial interests, and that the only expenses permitted by federal law for the District to cover are the "actual incremental expenses" of Dr. Fakorede and establishing his practice. (R.E. 1, PageID#16, para. 80). A week went by with no further updates. (Id., para. 81).

On February 9, Dr. Fakorede sent a text message to VP Montchal asking for an update on the audit and asking if she had received any additional documentation from Mid-South. (Id., para. 82). He received a response simply stating that she saw one document last week that spoke to medical supplies, and that the District had asked every line item be audited. (Id.).

## E. Mid-South Terminates Dr. Fakorede in Retaliation.

The next day, February 10, Mid-South's CEO, Dr. Cunningham requested to meet with Dr. Fakorede at 6:00 p.m. that evening. (R.E. 1, PageID#16, para. 83).

At the meeting, Dr. Cunningham told Dr. Fakorede to sign a letter of resignation by 7:00 a.m. the next morning or Dr. Fakorede would be terminated. (R.E. 1, PageID#16, para. 84). The purported justification for this request was that Dr. Cunningham knew Dr. Fakorede was not happy and that Mid-South was not happy either. (Id.).

At approximately 6:30 a.m. on February 11, 2015, Dr. Fakorede sent Dr. Cunningham a message stating that he was not willing to sign a resignation letter with the District's audit still pending and without ever having received the corrected financial report to review. (R.E. 1, PageID#16, para. 85). Immediately, Dr. Cunningham responded with a text message, which stated: "Dr. Fakorede your employment is terminated repeat is terminated. Any further communication concerning this matter may be directed to my attorney, Mr. Todd Siroky…". (Id., para. 86).

Thereafter, Mid-South sent Dr. Fakorede a letter stating that it was exercising its right to terminate him without cause. (R.E. 1, PageID#17, para. 87). The letter further stated that Mid-South was providing Dr. Fakorede with 120 days of pay, rather than 120 days' notice as required by the employment agreement. (Id., para. 88). Dr. Fakorede immediately informed both CEO Arnold and VP Montchal at the District of his termination by Mid-South in an email. (Id., para. 91). This email highlighted the fact that his termination came amidst the District's request

for a line-item audit of the financial report for his employment, which thus far had revealed an inappropriate expense attribution of $207,000 dollars. (Id.). Dr. Fakorede further noted that the inclusion of this expense "was in clear violation of the recruiting agreement (stating that the agreement is not to be used for the Clinic's financial benefit) and in violation of Stark Laws." (Id.). CEO Arnold responded and simply stated he regretted the development, was committed to a fair and legal resolution of all issues for all involved, and looked forward to Dr. Fakorede's continued service to the District. (R.E. 1, PageID#18, para. 92).

Due to his termination from Mid-South, Dr. Fakorede was placed in a precarious position with respect to his obligations under the Recruiting Agreement. Under the terms of the Recruiting Agreement, he was required to remain on staff at the Hospital, during the entirety of the 3-year term. However under the Hospital's by-laws, in order to be on staff, doctors must have a primary, physical office outside the Hospital where the doctor could see patients. (R.E. 1, PageID#17, para. 89). In order to fulfill his obligations, Dr. Fakorede either had to remain affiliated with a practice group in Jackson or establish his own office. (Id., para. 90).

Dr. Fakorede continued to correspond with the District to ask for updates on the audit and request supporting documentation regarding the expenses that Mid-South attributed to him. (R.E. 1, PageID#18, para. 93-94). On March 5, 2015, the District's General Counsel, Charleyn Reviere, sent Dr. Fakorede two letters. (Id.,

19

para. 95). The first letter contained the results of the District's audit. (Id., para. 96). The District had concluded that $314,238.08 had been overdrawn by Mid-South and would need to be refunded. (Id.). The audit also confirmed that the $207,230.94 depreciation expense for the OBL was not a legitimate expense attributable to him under the terms of his contract, in addition to other expenses that were disallowed. (Id.). At the time he filed his Complaint, Dr. Fakorede had not received any supporting documentation for Mid-South's financial report and the expenses attributed to him. (R.E. 1, PageID#19, para. 98).

The second letter from Ms. Reviere ominously informed Dr. Fakorede that should he leave the Jackson community or cease practicing there, then the current balance of the recruiting indebtedness would be due immediately. (Id., para. 102). Due to Mid-South's termination of him, Dr. Fakorede could not remain in Jackson, Tennessee, to practice, and moved to Mississippi to practice as a cardiologist. (Id., para. 103).

## Summary of the Argument

Dr. Fakorede's Complaint sufficiently plead a claim for retaliation in violation of 31 U.S.C. § 3730(h). Dr. Fakorede's Complaint plead allegations that demonstrated he was terminated by Mid-South after he engaged in protected activity in the form of reporting believed fraudulent expenses to Jackson-Madison County General Hospital District, which were submitted in violation of the federal

Stark Laws and the Anti-Kickback Statute. Dr. Fakorede reported to both Mid-South and the District concerns that an approximate $207,000 depreciation expense for a laboratory was not a cost directly related to Dr. Fakorede's practice during his first year as a cardiologist. A subsequent audit disallowed this expense, and ultimately disallowed over $314,000 in inappropriate expenses.

The District Court failed to construe the Complaint in the light most favorable to Dr. Fakorede and failed to make reasonable inferences in favor of Dr. Fakorede's allegations, as required under the applicable standard for considering a motion to dismiss. Additionally, the District Court relied on case law that is no longer relevant following amendments to the False Claims Act. Specifically, the District Court erred in failing to make reasonable inferences from the allegations in the Complaint that Dr. Fakorede's actions in repeatedly raising concerns to the District and to Mid-South directly regarding certain expenses fraudulently attributed to him constituted efforts to stop violations of the False Claims Act and avoid violations of the Stark Law. This Court should reverse the trial court's dismissal of this action, and reinstate it for further proceedings.

## III. ARGUMENT

## A. THIS COURT SHOULD REVERSE THE DISMISSAL OF DR. FAKOREDE'S COMPLAINT AS IT SUFFICIENTLY PLED A CLAIM FOR RETALIATION.

## 1.   THIS COURT REVIEWS DE NOVO THE DISTRICT COURT'S DISMISSAL OF PLAINTIFF'S COMPLAINT.

This Court reviews "de novo a district court's dismissal of a complaint for failure to state a claim, including dismissal for failure to plead with particularity under [Federal Rule of Civil Procedure] 9(b)." S*anderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 976 (6th Cir. 2006) (citing *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 563 (6th Cir. 2003)), cert denied., 549 U.S. 889.  In determining a motion to dismiss, this Court must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). "A motion to dismiss under Rule 12(b)(6) must be denied where the plaintiff 'pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Merritt v. Mountain Laurel Chalets, Inc.*, 96 F.Supp.3d 801, 811 (E.D. Tenn. 2015).

## 2. THE COMPLAINT SUFFICIENTLY PLED A CLAIM FOR RETALIATION UNDER THE FALSE CLAIMS ACT.

### a. Governing Law

In order to plead a claim for retaliation under the FCA, Dr. Fakorede's Complaint needed to allege: 1.) that Dr. Fakorede engaged in protected activity; 2.) that Mid-South knew that Dr. Fakorede engaged in protected activity, and 3.) that Mid-South fired him as a result of that protected activity. *U.S. ex rel. Marlar v. BWXY Y-12, LLC*, 525 F.3d 439, 449 (6th Cir. 2008). 31 U.S.C. § 3730(h) provides that any employee shall be entitled to all relief necessary to make that employee whole if that employee was discharged, demoted, suspended, threatened, harassed, or in any other matter discriminated against in the terms and conditions of employment because of "lawful acts done by the employee. . . in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." (Emphasis added).

The possible violations at issue in this action were violations of the federal Stark Law and the Anti-Kickback Statute ("AKS") related to the Recruiting Agreement between Dr. Fakorede, Mid-South, and the District. The AKS, 42 U.S.C. § 1320a-7b(b) prohibits payment or remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash in or in kind, to any person to induce such person to refer an individual to a person for the

furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

The Physician Self-Referral Act (the "Stark Law"), prohibits physicians from making a referral for furnishing health services to any entity with which the physician has a financial relationship. 42 U.S.C. § 1395nn(a)(1). Physician Recruiting Agreements, such as the Recruiting Agreement in this action, are exempted from coverage under the Stark Law only so long as certain requirements are met. 42 U.S.C. § 1395nn(a)(5). One critical requirement, which is the crux of Dr. Fakorede's concern in this case, is that "the costs allocated by the physician practice to the recruited physician do not exceed the <u>actual</u> additional incremental costs attributable to the recruited physician." 42 C.F.R. § 411.357(e)(3)(iii) (emphasis added). It was Dr. Fakorede's concern about a violation of this provision that motivated his actions in repeatedly contacting the District and Mid-South administrators to remedy any possible violation of the Stark law. (*See* R.E. 1, PageID#16, Para. 67; PageID#16, Para. 80).

**b. The allegations establish that Dr. Fakorede Engaged in Protected Activity.**

From December 2014 through his termination on February 11, 2015, Dr. Fakorede engaged in protected activity by repeatedly raising concerns about Mid-South submitting expenses to the District that were not actual additional incremental costs attributable to him. On several occasions, he requested

underlying documentation to support the attribution of these expenses, and requesting an independent review and audit of Mid-South's submitted expenses. (Complaint, R.E. 1, PageID#11-12, para. 60-61; PageID#14, para. 71-72). Dr. Fakorede's actions as pled in his Complaint, when viewed in totality, are sufficient to withstand a motion to dismiss.

For example, in an email on January 10, 2015, by Dr. Fakorede to Mid-South's Practice Manager, Mid-South's accountant, and the District's Financial Director, Dr. Fakorede took issue with the $207,000 depreciation expense for the OBL lab that Dr. Fakorede did no work in during the time for which the expenses were charged to him. (Complaint, R.E. 1, PageID#13, para. 67; PageID#18, para. 96). Significantly, the entire $207,000 expense was ultimately disallowed as an illegitimate expense submitted by Mid-South. (Complaint, R.E. 1, PageID#13, para. 67; PageID#18, para. 96). Dr. Fakorede's email to the District's VP Montchal on February 3, 2015, specifically addressed Dr. Fakorede's concern regarding the Recruiting Agreement and the federal law's requirement that only actual incremental expenses of Dr. Fakorede were permitted, and stated he was reassured by the line-item audit, an audit that was a direct result of Dr. Fakorede's actions. (Complaint, R.E. 1, PageID#15-16, para. 80).

These actions by Dr. Fakorede pled in the Complaint constitute protected activity as they were efforts to stop one or more violations of the Stark Law and

Anti-Kickback Statute by remedying expenses inappropriately attributed to Dr. Fakorede by Mid-South. The fact that the approximately $207,000 depreciation expense for the OBL lab was ultimately determined to be an illegitimate expense by the District shows the legitimacy of Dr. Fakorede's concern. (Complaint, R.E. 1, PageID#13-16).

Notably, the language in 31 U.S.C. § 3720(h)(1) which protects employees for undertaking "other efforts" to stop violations of the FCA was added by Congress in 2009. *Bonewitz v. NewQuest, LLC*, No. 3:14-CV-00096, 2015 WL 1825375, at *6 (E.D. Tenn. Apr. 22, 2015). These amendments were an effort by Congress "to broaden the protection afforded to those who take action to thwart fraud committed against the federal government." *Miller v. Abbot Labratories*, No. 3:14CV-00363-JHM, 2015 WL 3773114, at *5 (W.D. KY June 17, 2015) (quoting *Arthurs v. Global TPA LLC*, No. 6:14-CV-1209-Orl-40TBS, 2015 WL 1349986, at *3 (M.D. Fla. Mar. 25, 2015)). This Court has held that the legislative history of these amendments directs the courts to broadly construe protected activity. *McKenzie v. BellSouth Telecommunications, Inc.* ("*McKenzie II*"), 219 F.3d 508, 515 (6th Cir. 2000) (citing *U.S. ex. rel. McKenzie v. BellSouth Telecommunications, Inc.*, 123 F.3d 935, 944 (6th Cir. 1997), cert. denied, 522 U.S. 1077).

Protected activity of efforts to stop violations of the FCA can include reporting suspicious conduct to internal supervisors, which is what Dr. Fakorede did in this case. *Id.* (citing *Halasa v. ITT Educ. Services, Inc.*, 690 F.3d 844, 847-48 (7th Cir. 2012); *Tibor v. Michigan Orthopaedic Institute*, 72 F.Supp. 3d 750 (E.D. Mich. 2014)). Stated another way, an employee "must sufficiently allege activity with a nexus to a *qui tam* action, or fraud against the United States government." *Merritt*, 96 F.Supp.3d at 822. An employee does not have to "use formal words of 'illegality' or 'fraud.'" *Id.* (quoting *McKenzie v. BellSouth Telecommunications, Inc.* ("*McKenzie II*"), 219 F.3d 508, 516 (6th Cir. 2000)). The allegations of the employee must show that the allegations grew out of a reasonable belief that fraud is being committed against the government. *Jones-McNamara v. Holzer Health Sys.*, 630 F. App'x 399, 400 (6th Cir. 2015).

In *Merritt v. Mountain Laurel Chalets, Inc.*, two employees filed suit against their employer for retaliatory termination after they were terminated from their supervisor positions in cabin housekeeping after voicing concerns about their employer's payment of undocumented workers. *Merritt v. Mountain Laurel Chalets, Inc.*, 96 F.Supp.3d 801, 809-810 (E.D. Tenn. 2015). In reviewing the allegations of the plaintiffs on a motion to dismiss, the district court held that the factual allegations were sufficient to allege protected activity. *Id.* at 823. One employee's protected activity was informing management that he "would not take

such risks as falsely paying an undocumented worker" and "protested the employment of [the worker] as an illegality." *Id*. The other employee's allegations of protected activity were telling her supervisor that "it was wrong of [the employer] to hire an undocumented worker" and the fact that she reported her concerns of this to the IRS. *Id*. The court noted that the term "wrong" could be "construed in myriad ways," but the fact that the employee reported those concerns to the IRS strongly suggested that she considered it illegal for the employer to hire an undocumented worker. *Id*.

Likewise, in *Tibor v. Michigan Orthopaedic Institute*, 72 F.Supp. 3d 750, 754 (E.D. Mich. 2014), a surgeon brought a retaliation suit against her former employer alleging that she was terminated after she refused to sign certain contracts which she believed violated Stark anti-referral laws. The district court in *Tibor* held that the plaintiff surgeon had satisfied her burden of stating a claim for relief under § 3730(h) for engaging in protected activity in that the complaint "properly alleges that Plaintiff informed Defendant of her concerns" related to violations of the Stark Law. *Id*. at 762.

Surprisingly, the District Court in this case wrongly distinguished the actions and allegations of the plaintiffs in *Merritt* and *Tibor* from Dr. Fakorede's actions and allegations in his Complaint. However, a review of *Merritt* and *Tibor*, and the factual allegations pled in Dr. Fakorede's Complaint supports a reversal of

28

the District Court's determination that Dr. Fakorede did not sufficiently plead protected activity. Dr. Fakorede raised specific concerns regarding expenses he believed were fraudulently attributed to him by Mid-South. (Complaint, R.E. 1, PageID#13-16).  Dr. Fakorede requested an independent review and audit of the financial statements related to these expenses. (R.E. 1, PageID#14, para. 72). Dr. Fakorede emailed the District's Financial Director, Mid-South's Practice Manager, and Mid-South's accountant and asked them to revisit the $207,000 depreciation expense drawn from his loan. (R.E. 1, PageID#13, para. 67).

In addition, Dr. Fakorede stated in an email to the District's VP that the Recruiting Agreement that was signed by the District and Mid-South contained express language that the agreement was not meant to advance the clinic's financial interests, and that only expenses permitted by federal law for the hospital to cover are those expenses that were the "actual incremental expenses of recruiting the Physician and establishing the Physician's practice." (R.E. 1, PageID#15-16, para. 80, emphasis supplied).  This warning by Dr. Fakorede tracked almost exactly the critical requirement of the Stark law, which requires that "the costs allocated by the physician practice to the recruited physician do not exceed the actual additional incremental costs attributable to the recruited physician." 42 C.F.R. Sec. 411.357(e)(3)(iii).

Dr. Fakorede was informed by VP Montchal that she had been "in conversation with everyone" regarding his concerns, and Dr. Fakorede is entitled to the inference that this included representatives of Mid-South. (R.E. 1, Page ID#15, para. 76). In addition, one of the persons Dr. Fakorede raised concerns to about the inappropriate expenses was Mid-South's Practice Manager, and Mid-South's own accountant, Mickey Hannon, who defended the expenses as appropriate. (R.E. 1, Page ID#13, Para. 67-68). Dr. Fakorede specifically noted to Mid-South that he had not even used the OBL lab until October 29, 2014, even though OBL lab expenses were attributed to him to his entire first year term which ended on October 31, 2014. (Id). Ultimately, Mr. Hannon's defense of the OBL lab expenses failed, and the District disallowed the OBL expense as not actual incremental expenses attributable to Dr. Fakorede. (R.E. 1, PageID#18, para. 96). VP Montchal also informed Dr. Fakorede during in-person meeting that she had spoken with Mid-South's CEO Dr. Cunningham, the same individual who terminated Dr. Fakorede, that the District would be requesting a refund of the approximately $207,000 OBL expense. (R.E. 1, PageID#15, para. 77). Thus, Dr. Cunningham knew that Dr. Fakorede's concerns about improper expenses had triggered an audit disallowing over $207,000 in expenses that were in violation of federal law. (Id).

After all the suspicions and concerns raised by Dr. Fakorede about costs fraudulently attributed to him, including triggering an initial audit that disallowed over $207,000 in expenses, Mid-South's CEO informed Dr. Fakorede that he needed to resign because he (Dr. Fakorede) was "not happy." (Complaint, R.E. 1, PageID#13, para. 67; PageID#16, para. 84; PageID#18, para. 96). When Dr. Fakorede responded that he would not resign with the District's line-item audit of the submitted expenses pending, Mid-South terminated Dr. Fakorede within minutes of his response with a blunt and direct text message simply stating "Dr. Fakorede your employment is terminated repeat is terminated." (R.E. 1, PageID#16, para. 86).

The Eastern District Court of Michigan recently ruled that conduct by a plaintiff similar to Dr. Fakorede's conduct was sufficient to establish a prima facie case of retaliation and sufficiently demonstrated protected activity. *Ickes v. Nexcare Health Systems, LLC*, No. 13-14260, 2016 WL 1275543 (E.D. Mich. Mar. 31, 2016). In *Ickes*, the plaintiff, a licensed physical therapist at a nursing home, grew concerned that her employer was discharging patients for improper reasons in violation of federal regulations. *Id*. at *12. She raised these concerns by informing her supervisors that patients were being improperly told there were no long-term beds available. *Id*. at *12. The district court noted that the 2009 statutory amendments to the FCA removed any requirement that protected conduct could

31

lead to a viable FCA action.  Instead, the Court held that the plaintiff's actions were protected conduct by raising the issue of whether the nursing home was improperly telling patients that long-term beds were not available. *Id*. The court held that the plaintiff's efforts were an attempt to stop the nursing home from discharging patients once their payment sourced changed from Medicare to less lucrative sources, and was raising this concern to stop a violation of the FCA. *Id*.

The recent decision in *Ickes* is consistent with other case law and shows the District Court's decision was in error in this case. Taking the factual allegations of the Complaint in this case as true, along with the reasonable inferences arising therefrom, the actions of Dr. Fakorede from early December 2014 through his termination in February 2015 as pled in his Complaint sufficiently allege protected activity under § 3730(h), as did the plaintiffs in *Merritt*, *Tibor*, and *Ickes*. This is especially true given the broad interpretation required to be given protected activity and the fact that a plaintiff does not have to use the formal words "illegality" or "fraud" when raising their concerns. *McKenzie II*, 219 F.3d at 515; *Merritt*, 96 F.Supp.3d at 822.

## d. Specific use of the word "fraud is not required to establish protected activity.

Mid-South's argument in support of its Motion to Dismiss appears to be that Dr. Fakorede did not allege a statement in which he used the precise word "fraud" when he informed Mid-South and the District that he was concerned about Mid-

South attributing improper expenses to him.  Essentially, Mid-South contends that the absence of the specific use of the word "fraud" renders all of Dr. Fakorede's efforts in asking the District to review the expenses more closely and requesting an audit of the expenses completely unprotected under the FCA.  Mid-South also argues broadly that none of Dr. Fakorede's allegations in the complaint pertain to alleged violations of federal law.  However, an employee does not have to "use formal words of 'illegality' or 'fraud.'"  *McKenzie II*, 219 F.3d at 516.

In addition, Mid-South's argument fails to address the email sent by Dr. Fakorede to Mid-South's Practice Manager and outside accountant, Hannon, which requested that Mid-South and the District revisit the $207,000 OBL lab expense attributed to him. Mid-South simply brushes aside Dr. Fakorede's allegation pled in Paragraph 67 of his Complaint. (*See* Memo., R.E. 17, PageID#54).   Dr. Fakorede repeatedly voiced concerns about the expenses attributed to him, expenses which are required under federal law to be "actual additional incremental costs attributable" to him, and also called attention to the depreciation cost of the OBL lab, which he had not used until three days before the completion of his first-year term, yet was included as an expense attributable to him. (Complaint, R.E. 1, PageID#13-16).

Dr. Fakorede's statements about the inclusion of the $207,000 depreciation expense related to the OBL lab are not mere grumblings about general misconduct,

but were specific claims of wrongdoing with a clear nexus to a possible violation of the Stark Law and the AKS. Mid-South was aware that Dr. Fakorede was concerned about the inclusion of this specific expense both through his email on January 10th to the Mid-South and the District, as well as through District employees who were conveying these concerns raised by Dr. Fakorede to Mid-South, as specifically alleged by Dr. Fakorede. (See Complaint, R.E. 1, PageID#12-13, para. 66-67).  Mid-South and Dr. Cunningham were also aware before Dr. Fakorede was terminated, that the initial audit had caused over $207,000 in expenses to be disallowed. (R.E. 1, PageID#15, para. 77).

### e. Cases Relied Upon by Mid-South and the District Court are Distinguishable from this case.

The cases relied upon by Mid-South are distinguishable. In *Miller v. Abbott Labratories*, a case cited by Mid-South, an employee brought an action against her former employer contending that she was terminated after she reported a co-worker's bribe of $50 to the executive director. *Miller*, 2015 WL 3773114. The "bribe" arose out of a competition created by a district manager of the employer for sales representatives to create the best original protocol for healthcare providers with the winner receiving $100. *Id*. at *2. Miller was a sales representative and discovered that one of her co-workers had offered an executive director at a nursing home one half of the $100 prize money if she helped him create the

protocol. *Id*. Miller was subsequently terminated ostensibly for poor performance and later filed suit on the basis of retaliation. *Id*. at *3.

The employer moved for summary judgment on the basis that Miller had not engaged in protected activity. *Id*. The district court held that Miller's conduct in reporting the $50 "bribe" was not protected activity as Miller failed to establish a nexus between the report of the $50 and exposing fraud on the government. *Id*. at *6. The district court seemed persuaded by the testimony of Miller that she understood that from the executive director of the nursing home the "bribe was not going to ever take place," and at the time she reported the bribe to her supervisor and the OEC she never thought it was actually going to be carried out. *Id*. This Court recently affirmed the dismissal of Miller's claim in *Miller v. Abbott Laboratories*, No. 15-5762, 2016 WL 2799688 (6th Cir. May 12, 2016).

The district court's ruling focused on the testimony by Miller in determining that she failed to demonstrate protected activity, as she could not have had a reasonable belief that an FCA violation would occur when she knew that the nursing home executive director would not be induced by the bribe. Therefore, she could not reasonably believe that fraudulent Medicare or Medicaid claims would be submitted to the government as part of an AKS violation involving the bribe, a fatal blow to her claim. *Id*. at *6.

*Miller* is significantly different than the facts in this action. First, *Miller* was decided at the summary judgment stage, and not on a motion to dismiss, as in this case. Second, unlike in *Miller*, Mid-South had already submitted in its financial statements the $207,000 OBL expense, falsely claiming that it was an <u>actual</u> additional incremental expense attributable to Dr. Fakorede when Dr. Fakorede raised his concerns regarding the expense. Attributing an expense that was not actually incurred as a result of his practice would have been in violation of the Recruiting Agreement and the Stark Law. *See* 42 U.S.C. 1395nn. Thus, Dr. Fakorede has sufficiently alleged protected activity in his Complaint as he had a reasonable belief that the inclusion of this expense would lead to an FCA violation. This belief is buttressed by the fact that the OBL lab expense was ultimately disallowed by the District as inappropriate.

Likewise, *U.S. ex. rel. Lockyer v. Hawaii Pacific Health*, 490 F.Supp.2d 1062 (D. Hawaii 2007), is distinguishable as a pre-2009 FCA amendment case. In *Lockyer*, an employee raised concerns about his own compensation to his employers, and following his termination, he filed a retaliation claim. *Id.* at 1069. The district court found that Lockyer had failed to demonstrate at the summary judgment stage that he had engaged in protected activity because there was no affirmative evidence that the plaintiff had the reasonable belief that his employer

36

was conducting fraud against the government when he requested documentation of his pay. *Id.* at 1083-1084.

The district court was persuaded by the employee's deposition testimony in which he stated that he requested the compensation information because he did not think his pay was accurate, not because he believed that fraud was being committed. *Id.* at 1084. Lockyer bears no similarity to the facts as pled in Dr. Fakorede's Complaint, because Dr. Fakorede specifically pled that he was concerned about expenses being attributed to him because of possible violations of the Stark Law. (Complaint, R.E. 1, PageID#13-16).

**f. The District Court's Finding that Dr. Fakorede was Acting in his own Self-Interest Ignores the Standard of Review.**

In its opinion, the District Court stated that Dr. Fakorede's allegations "reveal nothing more than a desire to minimize his personal financial liability under the [Recruiting Agreement], not an effort to stop an FCA violation" despite "his insistence to the contrary." (Order, R.E. 34, PageID#202). In doing so, the District Court appeared to reference its previous statement that it would consider the Recruiting Agreement in its analysis of Mid-South's Motion to Dismiss. (Order, R.E. 34, PageID#190-191). To the extent that these rulings by the District Court are disregarding factual allegations of Dr. Fakorede in his Complaint, and weighing those factual allegations against the District Court's analysis of the

37

provisions of the Recruiting Agreement, the District Court applied the wrong legal standard for analysis.

In determining a motion to dismiss, the court must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.*, 550 U.S. 544. Dr. Fakorede alleged that his concern was not a personal concern because Mid-South indemnified him for any overpayment that had to be returned by the District. (R.E. 1, PageID#13-14, para. 70-71). Rather, he alleged his concern was violation of the Recruiting Agreement, which is governed by federal law. (R.E. 1, PageID#14, para. 70). In this case, Dr. Fakorede's Complaint set forth allegations that demonstrated his concern was for improperly attributing expenses to him in violation of federal law, and the District Court erred if it determined otherwise. (Complaint, R.E. 1, PageID#13-16).

## g. Mid-South Had Notice of Dr. Fakorede's Claims.

The District Court's opinion did not specifically address Mid-South's claim that Dr. Fakorede's Complaint did not plausibly show that Mid-South had notice of any alleged protected activity. Mid-South argued that the actions by Dr. Fakorede in repeatedly raising concerns about expenses attributed to him by Mid-South, including the January 10th email in which he asked Mid-South's Practice Manager

and outside accountant to revisit the issue of the $207,000 OBL lab expense, were insufficient to put Mid-South on notice that Dr. Fakorede was engaged in efforts to stop violations of the FCA. Mid-South attempts to align Dr. Fakorede's conduct with those of the plaintiff addressed in *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559 (6th Cir. 2003). Mid-South argues that his efforts were no more than Dr. Fakorede acting within the scope of his employment and contractual obligations requiring accurate and compliant financial reports. (Memo., R.E. 17, PageID#65).

In *Yuhasz*, this Court held that the plaintiff's complaints that his employer was falsely certifying alloys as compliant with applicable testing standards was not providing notice to his employer that he was engaged in protected activity. *Id*. at 567-568. The Court made this determination based on the fact that plaintiff's job description was to supervise the manufacturer's testing facility. Therefore, the Court found that his complaints were consistent with his normal duties and not indicative of anticipated legal action. *Id*.

However, as noted in *Mikhaeil v. Walgreens, Inc.*, the *Yuhasz* opinion was prior to the 2009 amendments to the FCA, which broadened the definition of protected activity. *Mikhaeil*, No. 13-14107, 2015 WL 778179, at *9 (E.D. Mich. Feb. 24, 2015). In *Mikhaeil*, the court noted that following the amendments to the FCA, a plaintiff's conduct in engaging in an effort to stop an FCA violation by making an internal report suffices as both the effort to stop the FCA violation **and**

the notice to the employer that the employee is engaging in protected activity. *Id.* (citing *Manfield v. Alutiiq Int'l Solutions, Inc.*, 851 F.Supp.2d 196, 204 (D. Me. 2012)) (emphasis supplied). The reliance on the situation in *Yuhasz* to support Mid-South's argument in this case is misplaced.

Dr. Fakorede's role was as a cardiologist and not as a compliance officer. Dr. Fakorede's concern as pled in his Complaint was for possible violations of the Stark Law. (Complaint, R.E. 1, PageID#13-16). To assert that Dr. Fakorede was acting as some kind of compliance officer is simply incorrect, and not supported by the allegations in the Complaint. Further, as discussed at length in this brief, Dr. Fakorede raised specific concerns about expenses attributed to him, including the $207,000 depreciation expense, in communications that included a January 10th email directly to Mid-South's Practice Manager and Mid-South's outside accountant. (Complaint, R.E. 1, PageID#13, Para. 67). Further notice that Mid-South was aware that this concern was raised is the allegation of the January 12th, 2015 email sent by Mid-South's outside account Mickey Hannon to the District's Financial Director responding to the January 10th email and defending the $207,000 OBL depreciation expense as a reasonable expense attributable to Dr. Fakorede. (Complaint, R.E. 1, PageID#13, Para. 68). Mid-South's argument that the Complaint did not set forth allegations that it was on notice of Dr. Fakorede's protected activity simply has no merit.

**h. Dr. Fakorede's Complaint Alleged a Plausible Link Between His Protected Activity and His Termination.**

The District Court held that Dr. Fakorede's Complaint failed to allege a causal connection between his protected activity and his termination. (Order, R.E. 34, PageID#202). The District Court based this holding on its determination that Dr. Fakorede had not engaged in any protected activity until after his termination. (Id.). As discussed at length above, Dr. Fakorede engaged in protected activity from December 2014 through his termination in February 2015. In order to establish a causal connection between an employee's conduct and his termination, the employee must allege sufficient facts from which a jury could conclude that the employee was terminated at least in part by the employee engaging in protected activity. *Mikhaeil*, 2015 WL 778179, at *9 (citing *McKenzie*, 219 F.3d at 518). "Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008).

Mid-South made the meager argument in support of its motion to dismiss that Dr. Fakorede's Complaint failed to allege sufficient facts to allege a causal connection. (Memo., R.E. 17, PageID#16-17). Dr. Fakorede's Complaint set forth sufficient allegations from which a reasonable jury could conclude that he was

terminated at least in part due to his conduct of raising concern about the expenses fraudulently attributed to him by Mid-South, including the $207,000 depreciation expense.

Dr. Fakorede was terminated by Mid-South's CEO in a text message on February 11, 2015. (Complaint, R.E. 1, PageID#16, Para. 86). This termination on February 11th came in close temporal proximity to Dr. Fakorede's efforts to bring attention to the expenses which he believed were wrongly attributed to him. (*See* Complaint, R.E. 1, PageID#13-16). Dr. Fakorede's termination also came within two weeks after the District disallowed the $207,000 OBL depreciation expense that he had repeatedly objected to, and after the District ordered a line-item audit of Mid-South's financial reports, an audit which Dr. Fakorede had requested. (Complaint, R.E. 1, PageID#13-16). As noted in *Mickey*, close temporal proximity between the employer learning of the employee's protected activity and the termination can be sufficient to set forth a causal connection. *Mickey*, 516 F.3d at 525.

In *Mikhaeil*, the plaintiff, like here, was terminated within two weeks of her protected activity and the district court held this was sufficient to establish a causal connection. *Mikhaeil*, 2015 WL 778179, at *9-10 (citing *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 306 (6th Cir. 2012) ("A lapse of two months, as is the case here, is sufficient to show a causal connection, and the district court erred

in holding otherwise."); *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 435–36 (6th Cir. 2009) ("The combination of this increased scrutiny with the temporal proximity of his termination occurring less than three months after his [protected activity] is sufficient to establish the causal nexus needed to establish a prima facie case .")).

Dr. Fakorede's allegations were sufficient to establish the causal nexus between Dr. Fakorede's protected activity and his termination.

## IV. CONCLUSION

Plaintiff, Dr. Foluso Fakorede, asks this Court to reverse the District Court's dismissal of his Complaint and permit Plaintiff's suit to proceed.

Respectfully submitted:

s/ Donald Capparella
Donald Capparella, BPR# 011239
Elizabeth Sitgreaves, BPR#27539
Dodson Parker Behm & Capparella, PC
1310 6th Ave North
Nashville, TN 37208
(615) 254-2291
(615) 726-2241 (fax)
Capparella@dodsonparker.com
esitgreaves@dodsonparker.com

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 9,638 words, excluding the parts of the brief exempted by Fed. R. App. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. (32)(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman.

<u>/s/ Donald Capparella</u>
Donald Capparella

Attorney for Foluso Fakorede
Dated: <u>July 7, 2016</u>

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing document was sent via the Court's ECF system to the following:

Brian D. Roark
Brittain W. Sexton
Bass Berry & Sims, PLLC
150 Third Ave S, Suite 2800
Nashville, TN 37201-3001

Todd D. Sikory
Sikory Law, PLC
316 South Shannon Street
Jackson, TN 38302-1625

On this the 7th day of July, 2016.

<u>/s/ Donald Capparella</u>
Donald Capparella

44

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

| Number | Description | Page Numbers |
|---|---|---|
| 1 | Complaint | 1-26 |
| 34 | Order Granting Motion to Dismiss (from which appeal taken) | 152-163 |
| 35 | Judgment (from which appeal taken) | 204 |
| 36 | Notice of Appeal | 205-206 |
| 12 | Motion for Extension to File Answer | 39-40 |
| 13 | Order Granting Motion for Extension | 41 |
| 16 | Motion to Dismiss | 46-47 |
| 17 | Memorandum in Support of Motion to Dismiss | 48-68 |
| 18 | Declaration of Brittain Sexton in Support of Motion to Dismiss (with exhibits) | Sealed |
| 21 | Scheduling Order | 111-113 |
| 23 | Motion for Extension | 118-120 |
| 25 | Response to Motion to Dismiss | 122-145 |
| 28 | Reply to Response to Motion to Dismiss | 152-163 |