# CASE NO. 16-5722

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

### FOLUSO FAKOREDE

**Plaintiff-Appellant**

v.

### MID-SOUTH HEART CENTER, P.C.

**Defendant-Appellee**

## ON APPEAL FROM
## THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE

## BRIEF OF DEFENDANT-APPELLEE
## MID-SOUTH HEART CENTER, P.C.

Brian D. Roark, Esq.
Brittain W. Sexton, Esq.
Bass, Berry & Sims PLC
150 Third Avenue South, Suite 2800
Nashville, TN 37201

Todd D. Siroky, Esq.
Siroky Law, PLC
316 South Shannon Street
Jackson, TN 38302-1625

*Attorneys for Defendant-Appellee*

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| **FOLUSO FAKOREDE** | ) | |
| | ) | |
| **Plaintiff/Appellant** | ) | |
| | ) | |
| **V.** | ) | **CASE NO.  16-5722** |
| | ) | |
| **MID-SOUTH HEART CENTER, P.C.,** | ) | |
| | ) | |
| **Defendant/Appellee** | ) | |

## DISCLOSURE OF CORPORATE AFFILIATIONS AND FINANCIAL INTERESTS

Pursuant to Rule 26.1 of the Rules of the Sixth Circuit Court of Appeals,

Mid-South Heart Center, P.C. makes the following disclosure:

1.    Is said party a subsidiary or an affiliate of a publicly owned
corporation?  No.

2.    Is there a publicly owned corporation, not a party to the appeal, that
has a financial interest in the outcome?  No.

*s/ Brian D. Roark* _____        8/9/16
**Signature**                              **Date**

i

# <u>TABLE OF CONTENTS</u>

DISCLOSURE OF CORPORATE AFFILIATIONS AND FINANCIAL INTERESTS .................................................................................. I

STATEMENT REGARDING ORAL ARGUMENT ............................................ 1

STATEMENT OF ISSUES ................................................................................ 1

STATEMENT OF THE CASE ........................................................................... 2

STATEMENT OF THE FACTS ......................................................................... 3

     I.     The Factual Allegations in the Complaint Do Not Support Dr. Fakorede's Claim. .......................................................................... 3

     II.    The Complaint Does Not Allege That Dr. Fakorede Made Efforts to Stop False Claims to the Government. ................................. 7

SUMMARY OF THE ARGUMENT ................................................................. 9

STANDARD OF REVIEW ............................................................................. 11

ARGUMENT ................................................................................................... 12

     I.     The False Claims Act Only Applies Where Fraudulent Claims Are Submitted to the Government. ....................................... 12

     II.    Dr. Fakorede's Complaint Does Not Allege Protected Activity. .......... 14

           A.    Alleged Efforts to Stop Stark/Anti-Kickback Violations Are Not, Standing Alone, Protected Activity under the FCA. ............ 15

           B.    The Complaint Does Not Show a Nexus Between the Alleged Stark/Anti-Kickback Concerns and Violations of the FCA. ........................................................................................ 20

           C.    Dr. Fakorede Does Not Allege He Acted with the Belief MSHC Would Commit Fraud against the Government. ............. 23

           D.    Dr. Fakorede Did Not Raise Stark/Anti-Kickback Concerns with MSHC Until after His Termination. ...................................... 24

1.    Dr. Fakorede's Emails on January 9 and 10 Occurred before His Purported Stark/Anti-Kickback Concerns. ...................................26

2.    Dr. Fakorede's February 11 Text Message Was Sent after His Termination. ........................................................................................27

3.    Other Conduct Raised in the Appellant Brief Was Directed at the Hospital, Not MSHC. ....................................................27

III.    The District Court Correctly Held That Alleged Protective Activity Occurring After Termination Cannot Have Caused Termination. ...................................................................................29

IV.    Alternatively, Dr. Fakorede Failed to Plead That MSHC Had Notice of What He Argues Was Protected Activity. ............................31

A.    The Complaint Contains No Allegations That Plausibly Show Notice of Any Efforts to Stop FCA Violations. .................31

B.    Consideration of the Underlying Agreements Further Illustrates MSHC's Lack of Notice. .............................................32

V.    None of the Case Law Discussed in the Appellant Brief Undermines the District Court's Order. .................................................34

CONCLUSION ..................................................................................................40

CERTIFICATE OF COMPLIANCE ......................................................................41

CERTIFICATE OF SERVICE ..............................................................................42

DEFENDANT'S/APPELLEE'S    DESIGNATION    OF    RELEVANT DISTRICT COURT DOCUMENTS ...........................................................43

# TABLE OF AUTHORITIES

CASES                                                                                  PAGE(S)

*Allison Engine Co. v. U.S. ex rel. Sanders*,
    553 U.S. 662 (2008)............................................................................19

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...................................................................11, 21, 22

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)........................................................................11, 22

*Bonewitz v. NewQuest, LLC*,
    2015 WL 1825375 (M.D. Tenn. Apr. 22, 2015) ........................................passim

*Boyd v. Keystone Constr.*,
    2014 WL 5148658 (S.D. Ind. Oct. 14, 2014) ....................................................19

*Chesbrough v. VPA, P.C.*,
    655 F.3d 461 (6th Cir. 2011) .........................................................................21, 24

*Dookeran v. Mercy Hosp. of Pittsburgh*,
    281 F.3d 105 (3d Cir. 2002) ...............................................................................18

*Farmer v. Eagle Sys. & Serv., Inc.*,
    WL 3564386 (4th Cir. July 1, 2016)................................................17, 22, 37, 38

*Farnsworth v. HCA, Inc.*,
    2015 WL 3453621 (M.D. Fla. May 29, 2015) ...................................................18

*Green v. City of St. Louis*,
    507 F.3d 662 (8th Cir. 2007) .............................................................................18

*Hamilton v. Gen. Elec. Co.*,
    556 F.3d 428 (6th Cir. 2009) .............................................................................30

*Ickes v. Nexcare Health Systems, LLC*,
    2016 WL 1275543 (E.D. Mich. Mar. 31, 2016)................................................36

*In re Travel Agent Comm'n Antitrust Litig.*,
    583 F.3d 896 (6th Cir. 2009) .............................................................................21

*Jonassen v. Port of Seattle*,
   550 F. App'x 384 (9th Cir. 2013) .......................................................................18

*Jones-McNamara v. Holzer Health Sys.*,
   630 F. App'x 394 (6th Cir. 2015) ..................................................................passim

*McKenzie v. BellSouth Telecommunications, Inc.*,
   219 F.3d 508 (6th Cir. 2000) .................................................................13, 16, 20

*Merritt v. Mountain Laurel Chalets, Inc.*,
   96 F.Supp.3d 801 .............................................................................................36

*Mickey v. Zeidler Tool & Die Co.*,
   516 F.3d 516 (6th Cir. 2008) ...........................................................................30

*Mikhaeil v. Walgreens Inc.*,
   2015 WL 778179 (E.D. Mich. Feb. 24, 2015)...........................................30, 35

*Miller v. Abbott Labs.*,
   2016 WL 2799688 (6th Cir. May 12, 2016)...............................................15, 16

*Tibor v. Michigan Orthopaedic Institute*,
   72 F. Supp. 3d 750 (E.D. Mich. 2014) ......................................................36, 37

*United States ex rel. Hopper v. Anton*,
   91 F.3d 1261 (9th Cir. 1996) ...........................................................................17

*United States ex rel. Johnson v. Kaner Med. Grp., P.A.*,
   2016 WL 873816 (5th Cir. Mar. 7, 2016)...................................................17, 38

*United States ex rel. New Mexico v. Deming Hosp. Corp.*,
   992 F. Supp. 2d 1137 (D.N.M. 2013) ..............................................................19

*United States ex rel. Willette v. Univ. of Mass.*,
   80 F. Supp. 3d 296 ...........................................................................................19

*United States ex rel. Ziebell v. Fox Valley Workforce Dev. Bd., Inc.*,
   806 F.3d 946 (7th Cir. 2015) ......................................................17, 20, 38, 39

*United States v. Bornstein*,
   423 U.S. 303 (1976).........................................................................................12

*Universal Health Servs., Inc. v. United States*,
   136 S. Ct. 1989 (2016)...........................................................................12, 14, 16

*Verble v. Morgan Stanley Smith Barney, LLC*,
   148 F. Supp. 3d 644 ................................................................................18

*Watts v. Lyon Cty. Ambulance Serv.*,
   2013 WL 557274 (W.D. Ky. Feb. 12, 2013).....................................................19

*Yuhasz v. Brush Wellman, Inc.*,
   341 F.3d 559 (6th Cir. 2003) ...............................................................13, 31, 34

### STATUTES

31 U.S.C. § 3729(a)(1)(A) ..................................................................................12

31 U.S.C. § 3730(h) ...................................................................................passim

31 U.S.C. § 3730(h)(1)...........................................................................14, 16, 38

## STATEMENT REGARDING ORAL ARGUMENT

The Defendant/Appellee, Mid-South Heart Center, P.C. (hereinafter "MSHC") does not believe that oral argument will assist the Court. The facts and legal arguments have been adequately presented in the briefs and record, and MSHC is of the opinion that the decisional process will not be significantly aided by oral argument.

## STATEMENT OF ISSUES

1.     The Complaint does not allege that MSHC made claims for payment to the Government, that MSHC intended to make claims to the Government, or that Plaintiff complained about claims for payment to the Government. Does the Complaint plausibly allege that Plaintiff engaged in "efforts to stop" MSHC from submitting a "false or fraudulent claim" to the Government?

2.     Plaintiff argues that he engaged in alleged protected activity after his employer informed him of his termination. Could such alleged post-termination protected activity have caused his termination?

3.     The Complaint does not allege that Plaintiff raised any concerns regarding submission of claims to the Government with MSHC or anyone else. Does the Complaint plausibly allege that MSHC had notice that Plaintiff was engaging in efforts to stop a "false or fraudulent claim" to the Government?

1

## STATEMENT OF THE CASE

MSHC is a small physician practice specializing in cardiology with its primary office in Jackson, Tennessee.  Foluso Fakorede, M.D. was employed as a cardiologist with MSHC from mid-2013 until his termination on February 10, 2015.  Dr. Fakorede filed a Complaint against MSHC in the United States District Court for the Western District of Tennessee (the "district court") on November 25, 2015, alleging claims under the anti-retaliation provision of the False Claims Act ("FCA"), 31 U.S.C. § 3730(h).

Dr. Fakorede does not allege that MSHC submitted false claims to the government in violation of the substantive provisions of the FCA.  Rather, his sole cause of action is for retaliation.

In lieu of filing an Answer, MSHC filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).  MSHC's motion was based on Dr. Fakorede's failure to allege facts that plausibly supported any of the three elements of his § 3730(h) claim.  After a full opportunity for both parties to submit briefs, the district court granted MSHC's motion and dismissed the Complaint in its entirety on April 26, 2016 (the "Order").  Dr. Fakorede never sought leave to amend his Complaint with the district court either before or after that Order.  Instead, judgment was entered on May 4, 2016, and Dr. Fakorede opted to file a notice of appeal challenging the district court's Order.  This appeal ensued.

For the reasons stated herein, this Court should affirm the district court's Order in all respects.

## STATEMENT OF THE FACTS

### I.    The Factual Allegations in the Complaint Do Not Support Dr. Fakorede's Claim.

Dr. Fakorede executed a Recruiting Agreement on July 15, 2013, with the Jackson-Madison County General Hospital District (the "Hospital") and MSHC. That Recruiting Agreement was intended to address a "substantial need for an additional physician practicing in the specialty of Interventional Cardiology" and "benefit the community and the Service Area through increased availability, quality, and choice of patient care" by incentivizing Dr. Fakorede to practice cardiology in Jackson, Tennessee.[1] (Ex. A, Recruiting Agreement, Sealed R.E. 18, page 9; *see also* Compl., R.E. 1, PageID# 1, ¶ 3.)  The Hospital would pay Dr. Fakorede up to $5,000 for moving expenses, $75,000 for a cost of transition advance, a total of $90,000 toward his educational loans, and up to $500,000 in practice support for his first year of practice.  (*See* Ex. A, Recruiting Agreement, Sealed R.E. 18, page 5-7, ¶ 3; Compl., R.E. 1, PageID# 8, ¶¶ 39-40.)  In exchange, Dr. Fakorede agreed, among other things, to practice cardiology in Jackson for at least three years.  (*See* Ex. A, Recruiting Agreement, Sealed R.E. 18, page 3, ¶ 2;

---

[1]    The Complaint does not contend and Dr. Fakorede has not argued that his Recruiting Agreement does not facially comply with federal law.  (*See* Compl., R.E. 1, PageID# 2, ¶ 6.)

Compl., R.E. 1, PageID# 2, ¶ 5.)  If Dr. Fakorede left Jackson before the end of the three-year period, he agreed to refund money paid to him under the Recruiting Agreement.  (*See* Ex. A, Recruiting Agreement, Sealed R.E. 18, page 5, ¶ 2(j).)

Dr. Fakorede's Recruiting Agreement permitted him to draw up to $500,000 during his first year of practice, but provided that a refund would later be calculated based upon his net collections – *i.e.*, the difference between his gross collections and expenses.  (*See* Ex. A, Recruiting Agreement, Sealed R.E. 18, pages 2, 6, ¶¶ 1(c), 3(d).)  The sole purpose of this provision was to ensure that Dr. Fakorede would be paid a minimum of $500,000 for his first year of practice.  (*See* Compl., R.E. 1, PageID# 8, ¶¶ 40.)    Under Dr. Fakorede's Employment Agreement, which cross-referenced the Recruiting Agreement, MSHC agreed to indemnify Dr. Fakorede for any refund sought by the Hospital for an "overage." (*See* Ex. B Employment Agreement, Sealed R.E. 18, pages 35-36, ¶ 27.)  MSHC did not agree, however, to indemnify Dr. Fakorede for any other type of refund sought by the Hospital, such as a refund resulting from Dr. Fakorede's decision to leave Jackson before the mandatory three-year term.  Accordingly, it was in Dr. Fakorede's financial interest to minimize expenses that MSHC attributed to him in order to reduce any personal liability he might have to repay these sums.

According to the Complaint, in late 2014 and early 2015, Dr. Fakorede contacted the Hospital (not his employer, MSHC) to request all financial reports

4

that MSHC had submitted regarding his gross collections and expenses. (*See* Compl., R.E. 1, PageID# 10-11, ¶ 55.) After reviewing those reports, Dr. Fakorede was "troubled" by expenses related to MSHC's outpatient-based lab. (*See id.*, PageID# 11-12, ¶¶ 56-58, 60-62.)

On January 9, 2015, the Financial Director of the Hospital sent an email to MSHC's Practice Manager and its outside accountant noting that Dr. Fakorede had "'raised some questions' and was requesting certain underlying documents." (*See id.*, PageID# 12, ¶ 66.)

On January 10, 2015, Dr. Fakorede emailed representatives of the Hospital, while carbon copying MSHC's Practice Manager and accountant, and "expressed concerns about the financial report and requested that the District collaborate with the Clinic" regarding those expenses. (*Id.*, PageID# 13, ¶ 67.)

On January 12, 2015, MSHC's accountant opined in an email that the expenses in the financial reports had been correctly attributed to Dr. Fakorede. (*See id.*, PageID# 13, ¶ 68.) At that time, Dr. Fakorede "became concerned that the Clinic was deliberately and fraudulently misclassifying many of its expenses." (*Id.*, PageID# 13, ¶ 69.) The Complaint does not, however, allege that Dr. Fakorede expressed these purported concerns to anyone at MSHC until after his termination.

5

On January 16, 2015, Dr. Fakorede contacted the Hospital's CEO to request an independent review of the financial reports, and he made subsequent attempts to contact the Hospital on January 21 and 30 and February 2.  (*See id.*, PageID# 14-15, ¶¶ 72-75.)  The Complaint does not claim that MSHC was privy to those alleged communications or that Dr. Fakorede made any attempt to discuss this matter with MSHC.

On February 2, 2015, Hospital employees told Dr. Fakorede that they had informed MSHC that an "overage" refund would be requested – as contemplated under the terms of the Recruiting Agreement.  (*See id.*, PageID# 15, ¶ 77.)

Dr. Fakorede met with Dr. Louis Cunningham of MSHC on February 10, 2015.  (*Id.*, PageID# 16, ¶ 84.)  At that meeting, they did not discuss the expense reports, Dr. Fakorede's purported communications with the Hospital, or anything about the Recruiting Agreement.  Rather, Dr. Cunningham expressed that "he knew [Dr. Fakorede] was not happy and that the Clinic was not happy either" and then gave Dr. Fakorede the option of resignation or termination.  (*Id.*, PageID# 16, ¶ 84.)  On February 11, 2014, Dr. Fakorede informed Dr. Cunningham via text message that he chose termination.  (*See id.*, PageID# 16, ¶ 86.)  MSHC later provided Dr. Fakorede with a full 120 days of pay.  (*See id.*, PageID# 17, ¶ 88.)

According to the Complaint, Dr. Fakorede later wrote an email to the Hospital administration claiming that his termination had occurred "amidst the line

6

audit of the financial report for year one of my employment that is currently underway which thus far has revealed a false $207,000 dollars which was in clear violation of the recruiting agreement [and] Stark Laws." (*Id.*, PageID# 17, ¶ 91.)

Ultimately, the Hospital calculated the amount of the "overage" refund owed under the Recruiting Agreement as $314,238.08, which MSHC promptly refunded. (*See id.*, PageID# 18, ¶ 96.)  If MSHC had not paid back those funds pursuant to the "overage" refund provisions, Dr. Fakorede would have been personally liable to the Hospital for that amount because he later breached the Recruiting Agreement by moving to Mississippi before completing the requisite three years of practice in Jackson.  (*See id.*, PageID# 19, ¶ 103.)

## II.    The Complaint Does Not Allege That Dr. Fakorede Made Efforts to Stop False Claims to the Government.

In order to determine whether Dr. Fakorede pled a plausible claim, what is *not* in the Complaint is equally as important as what is:

- There are no factual allegations that MSHC submitted or caused the Hospital or any other party to submit any claims for payment to Medicare or Medicaid or any other governmental healthcare program. The Complaint does not, for example, allege that MSHC submitted any claim to the Government, that any third-party submitted a claim to the Government, or that Dr. Fakorede voiced concerns about or

7

otherwise took efforts to stop a claim from being submitted to the Government.

- The Complaint does not allege that MSHC intended to submit a false claim to the Government.

- The Complaint does not allege that MSHC or the Hospital received any reimbursement for claims from the Government.

- Dr. Fakorede does not allege that he voiced concerns about – or otherwise made efforts to stop – claims from being submitted to the Government.  Rather, he claims to have complained about "accounting shenanigans" that he argues could have resulted in violations of the Stark Law or Anti-Kickback Statute.  (Compl., R.E. 1, PageID# 14, ¶ 72.)  However, he does not even attempt to connect such these regulatory concerns to claims for payment to the Government.

- The Complaint does not allege that Dr. Fakorede was ever subjectively concerned about claims for payment to the Government. To the contrary, it alleges Dr. Fakorede was motivated by the belief that "it was simply not right for" MSHC "to retain hundreds of thousands of dollars advanced by the" Hospital "that the Clinic had no right to keep" and that he did not want his "his own reputation" to be

harmed through association with "illegal schemes." (Compl. , R.E. 1, PageID# 13-14, ¶ 70.)

- Dr. Fakorede does not claim that he acted with the intent to stop false claims from being submitted to the Government.

- Dr. Fakorede never brought, attempted to bring, or contemplated bringing a *qui tam* action based on the FCA.

While there is no magic formula, one would expect to find these sort of facts in a complaint asserting a § 3730(h) claim. Yet, Dr. Fakorede's Complaint includes no allegations from which these facts could be reasonably inferred.

## SUMMARY OF THE ARGUMENT

Because the Complaint lacks any allegation about MSHC or anyone submitting claims for payment to the Government, Dr. Fakorede has not plausibly alleged "efforts to stop" submission of false claims to the Government as required to plead a cause of action under 31 U.S.C. § 3730(h). For this reason alone, the district court's decision should be affirmed.

Dr. Fakorede incorrectly contends that his complaining about conduct that he says could be inferred as raising Stark Law or Anti-Kickback Statute concerns was sufficient to constitute protected activity, but his Complaint does not link his purported regulatory concerns to MSHC committing fraud against the Government. The district court correctly rejected Dr. Fakorede's argument.

Because well-settled law establishes that a plaintiff must plead a nexus between the alleged protected activity and false claims for payment to the Government, and Dr. Fakorede's Complaint contains no factual allegations demonstrating any such nexus, this Court should affirm the district court's decision.

The district court correctly held that any alleged protected activity that occurred after MSHC informed Dr. Fakorede of its decision to terminate him could not have caused his termination. It is axiomatic – and common sense – that an event occurring after the employer's decision to terminate could not have caused the termination. Here too, the district court did not err and should be affirmed.

Finally, the Complaint does not plausibly satisfy the notice element of Dr. Fakorede's claim. None of Dr. Fakorede's statements to MSHC pertained to false claims for payment to the Government and, therefore, could not have put MSHC on notice that Dr. Fakorede was engaging in conduct protected under the FCA. Nor does the Complaint allege that MSHC was aware of Dr. Fakorede's purported Stark or Anti-Kickback concerns prior to his termination. The Complaint discusses only two emails of which MSHC representatives were made aware, and Dr. Fakorede has admitted that both of those emails were sent before he purportedly became concerned about Stark or Anti-Kickback compliance. From MSHC's perspective, all facts available to MSHC at the time indicated that Dr.

Fakorede was simply trying to reduce his personal liability to the Hospital under the Recruiting Agreement.

## <u>STANDARD OF REVIEW</u>

Federal Rule of Civil Procedure 8(a) requires that a complaint articulate a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint must be dismissed under Rule 12(b)(6) when it fails to contain "sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint states a viable claim only if it includes factual "allegations plausibly suggesting (not merely consistent with)" a particular defendant's liability and states the grounds on which the claim rests. *Twombly*, 550 U.S. at 557. "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 555. A plaintiff's "obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (citations and internal quotation marks omitted). Rather, the court should disregard legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 678–79. "Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678–79.

# ARGUMENT

## I. The False Claims Act Only Applies Where Fraudulent Claims Are Submitted to the Government.

The FCA imposes civil liability on any person who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). Congress originally enacted the FCA to stop "the massive frauds perpetrated by large contractors during the Civil War." *United States v. Bornstein*, 423 U.S. 303, 309 (1976). While it has been subsequently amended many times, "its focus remains on those who present or directly induce the submission of false or fraudulent claims." *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 1996 (2016) (citing 31 U.S.C. § 3729(a)). As such, the FCA attaches liability not to the underlying fraudulent conduct but only where the fraudulent conduct resulted in the submission of false claims to the Government. *See Bonewitz v. NewQuest, LLC*, No. 3:14-CV-00096, 2015 WL 1825375, at *6 (M.D. Tenn. Apr. 22, 2015) ("A fraudulent claim against the United States 'is the *sine qua non* of a False Claims Act violation.'" quoting *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 878 (6th Cir. 2006)).

To promote its goal of preventing fraud on the Government, the FCA contains an anti-retaliation provision, which imposes liability on any employer that discharges an employee "because of lawful acts done by the employee . . . in

12

furtherance of an [FCA] action or other efforts to stop [one] or more violations of [the FCA]." 31 U.S.C. § 3730(h). The purpose of this statutory cause of action is to "protect[] employees who pursue, investigate, or otherwise contribute to an action exposing fraud against the government." *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 566 (6th Cir. 2003).

As with the FCA generally, § 3730(h) was not intended to provide recovery to all employees who complain about regulatory violations without a tie to the submission of false claims to the Government. *See McKenzie v. BellSouth Telecommunications, Inc.*, 219 F.3d 508, 517 (6th Cir. 2000) (explaining that plaintiff must establish "some nexus to the FCA"). Rather, § 3730(h) is narrowly tailored to apply only to employees acting to prevent false claims from being submitted to the Government. *See id.* at 516 (explaining that an employee "must allege fraud on the government" to constitute protected activity).

To establish a § 3730(h) claim, a plaintiff must allege: "(1) he engaged in a protected activity; (2) his employer knew that he engaged in the protected activity; and (3) his employer discharged or otherwise discriminated against the employee as a result of the protected activity." *Yuhasz*, 341 F.3d at 566. Dr. Fakorede's Complaint lacks factual allegations to plausibly state these elements.

13

## II.     Dr. Fakorede's Complaint Does Not Allege Protected Activity.

Until 2009, a plaintiff had to allege that he engaged in "lawful acts. . . in furtherance of an [FCA] action" to establish the "protected activity" element of a § 3730(h) claim.  Since then, Congress expanded § 3730(h) to provide that a plaintiff may also assert an FCA action based upon "other efforts to stop [one] or more violations of [the FCA]." 31 U.S.C. § 3730(h)(1).  Before the trial court, Dr. Fakorede conceded that he did not act to further an FCA action.  He did not allege that he expressed any intention to bring an FCA action during his employment or that he even contemplated bringing such an action.  As such, his Complaint relies entirely on the second "efforts to stop" prong.

In order to plead protected activity under the "efforts to stop" prong, a plaintiff must set forth factual allegations showing that he engaged in activities that "reasonably embody 'efforts to stop' FCA violations."  *Jones-McNamara v. Holzer Health Sys.*, 630 F. App'x 394, 399 (6th Cir. 2015); *see also Bonewitz*, 2015 WL 1825375, at *6 (explaining that the 2010 amendment to § 3730(h) does not eliminate the requirement that the alleged "protected activity reasonably lead to a viable FCA claim").  The FCA is not "an all-purpose antifraud statute." *Universal Health*, 136 S. Ct. at 2003 (citation and internal quotation marks omitted).  Mere allegations that the plaintiff acted to stop fraudulent activity or violations of other federal statutes are insufficient.  "[T]he crux of any FCA violation is that a false or

14

fraudulent claim is submitted to the government" and "[w]ithout this crucial link" any alleged employee complaints about improper employer activity are "simply not protected by the FCA." *Miller v. Abbott Labs.*, No. 15-5762, 2016 WL 2799688, at *8, n.7 (6th Cir. May 12, 2016).

Dr. Fakorede does not allege that he was acting to stop false claims from being submitted to the Government. His Complaint does not allege that MSHC submitted claims to the Government or intended to submit claims to the Government. Thus, Dr. Fakorede has not alleged protected activity for purposes of § 3730(h), and the district court correctly dismissed his claim under Rule 12(b)(6).

Dr. Fakorede's arguments, which focus on alleged efforts to stop other purported statutory violations, are unavailing.

### A.   Alleged Efforts to Stop Stark/Anti-Kickback Violations Are Not, Standing Alone, Protected Activity under the FCA.

Instead of alleging efforts to stop false claims to the Government, Dr. Fakorede's Complaint relies entirely on complaints that he allegedly raised regarding expenses claimed under his Recruiting Agreement, which he argues amounted to violations of the Stark Law or Anti-Kickback Statute. In his Appellant Brief, he expressly concedes that "[t]he possible violations at issue in this action were violations of the federal Stark Law and the Anti-Kickback Statute . . . related to the Recruiting Agreement between Dr. Fakorede," MSHC, and the Hospital. (Appellant Br. at 23.)

15

Dr. Fakorede incorrectly suggests that efforts to stop violations of the Stark Law or the Anti-Kickback Statute amount to protected activity under § 3730(h), whether or not such efforts are ultimately aimed at stopping a false claim to the Government. The FCA's anti-retaliation provision expressly applies only to "efforts to stop [one] or more violations of this subchapter [*i.e.*, the FCA]." § 3730(h)(1). It contains no reference to Stark/Anti-Kickback violations. To the extent that the factual allegations of Dr. Fakorede's Complaint allege that he raised concerns to MSHC about Stark/Anti-Kickback compliance unconnected to any FCA violation, Dr. Fakorede's cause of action fails under the plain statutory language of § 3730(h).

Liability under the FCA is limited to "those who present or directly induce the submission of false or fraudulent claims." *Universal Health*, 136 S. Ct. at 1996 (citing 31 U.S.C. § 3729(a)). The Sixth Circuit has expressly held that the purported concerns raised by plaintiff "must allege fraud on the government" to constitute protected activity under § 3730(h). *McKenzie*, 219 F.3d at 516. In cases applying the "efforts to stop" prong, the Sixth Circuit has reaffirmed that "a plaintiff's activities must reasonably embody 'efforts to stop' FCA violations." *Jones-McNamara*, 630 F. App'x at 399; *see also Miller*, 2016 WL 2799688, at *7 ("[T]he FCA does not purport to protect all reports of wrongdoing, only those that are in furtherance of . . . efforts to stop a violation of the FCA."). Because Dr.

Fakorede has not alleged he engaged in efforts to stop false claims for payment to the Government, his claim fails as a matter of well-settled law. *See U.S. ex rel. Hopper v. Anton*, 91 F.3d 1261, 1269 (9th Cir. 1996) ("Correcting regulatory problems may be a laudable goal, but one not actionable under the FCA in the absence of actual fraudulent conduct.").

Other circuits agree that, where a complaint – like Dr. Fakorede's Complaint in this case – fails to plead facts that connect the alleged protected conduct to some request for payment from the Government, such pleadings fail to state a § 3730(h) claim. *See Farmer v. Eagle Sys. & Serv., Inc.*, No. 15-1124, 2016 WL 3564386, at *2 (4th Cir. July 1, 2016) (affirming district court's dismissal of § 3730(h) claim under Rule 12(b)(6) because plaintiff failed to allege facts showing he had engaged in "protected activity" given that the alleged wrongdoing that he reported was not an FCA violation); *United States ex rel. Johnson v. Kaner Med. Grp., P.A.*, No. 15-10192, 2016 WL 873816, at *4 (5th Cir. Mar. 7, 2016) (holding that plaintiff's FCA retaliation claim failed because emails she sent raising concerns about the improper direct billing of patients did not "relate[] to the presentation of false claims for payment to the Government"); *United States ex rel. Ziebell v. Fox Valley Workforce Dev. Bd., Inc.*, 806 F.3d 946, 951 (7th Cir. 2015) (holding plaintiff's § 3730(h) claim lacked factual support, in part, because the documents underlying the alleged protected activity did not have "any apparent nexus to

17

federal payments"); *Jonassen v. Port of Seattle*, 550 F. App'x 384, 386 (9th Cir. 2013) (finding no protected activity because "[n]one of the matters [the employee] investigated involved the submission of a claim for payment to the federal government"); *Green v. City of St. Louis*, 507 F.3d 662, 668 (8th Cir. 2007) (holding that plaintiff did not engage in protected activity because his communications at issue did not "describe any actual fraudulent claim being presented to the government"); *Dookeran v. Mercy Hosp. of Pittsburgh*, 281 F.3d 105, 109 (3d Cir. 2002) (holding that plaintiff's claim failed because his alleged protected conduct did not involve "a request or demand for federal funds").

District courts interpreting the "efforts to stop" prong of § 3730(h) have reached the same conclusion. *See Verble v. Morgan Stanley Smith Barney, LLC*, 148 F. Supp. 3d 644, 657 (E.D. Tenn. 2015) ("To constitute an effort to stop a specific (or potential) violation of the FCA, an employee's conduct must be aimed at stopping specific fraudulent claims against the government."); *Farnsworth v. HCA, Inc.*, No. 8:15-cv-65, 2015 WL 3453621, at *7-8 (M.D. Fla. May 29, 2015) (granting Rule 12(b)(6) motion to dismiss because plaintiff's pleadings failed to "assert a factual basis" connecting her internal reports of misconduct to "the submission of a false claim to the government"); *Bonewitz*, 2015 WL 1825375, at *6 (holding that a plaintiff cannot establish that he engaged in protected activity where he "never raised any concern (internally or externally) regarding the

18

submission of actual false claims to the United States by" the defendant); *United States ex rel. Willette v. Univ. of Mass.*, 80 F. Supp. 3d 296, 304 (D. Mass. 2015) (holding plaintiff's proposed complaint failed to state an FCA retaliation claim because plaintiff's alleged internal reports "did not concern the submission of false claims to the government"); *Watts v. Lyon Cty. Ambulance Serv.*, No. 5:12-CV-00060, 2013 WL 557274, at *9 (W.D. Ky. Feb. 12, 2013) (dismissing FCA retaliation claim because plaintiff's complaint did not allege "that he submitted any report or other communication to [his employer] alleging fraud on the government" nor "that any fraud on the government actually occurred"); *Boyd v. Keystone Constr.*, No. 1:14-cv-119, 2014 WL 5148658, at *2 (S.D. Ind. Oct. 14, 2014) (granting defendant's motion to dismiss plaintiff's FCA retaliation claim because her alleged protected conduct did not "relate to claims for money from the federal government"); *United States ex rel. New Mexico v. Deming Hosp. Corp.*, 992 F. Supp. 2d 1137, 1165 (D.N.M. 2013) (dismissing complaint under Rule 12(b)(6) and holding that a plaintiff who complained of regulatory noncompliance failed to plead protected activity because "activities are only 'protected' for FCA whistleblower purposes if they 'concern the employer's knowing submission of false or fraudulent claims for payment to the government'" citation omitted).

Under well-settled law, Dr. Fakorede cannot be permitted to apply the FCA "beyond its intended role of combating 'fraud against the Government,'" *Allison*

*Engine Co. v. U.S. ex rel. Sanders*, 553 U.S. 662, 668 (2008), by conflating

purported concerns regarding Stark/Anti-Kickback compliance with efforts to stop

FCA violations – without some allegation that MSHC submitted or caused the

submission of false claims to the Government. *Ziebell*, 806 F.3d at 951. Thus, the

Court should affirm the district court and hold as a matter of law that mere

allegations of efforts to stop Stark/Anti-Kickback violations do not, standing alone,

establish protected activity for purposes of § 3730(h).

### B. The Complaint Does Not Show a Nexus Between the Alleged Stark/Anti-Kickback Concerns and Violations of the FCA.

The Complaint must show a plausible "nexus to a viable FCA action" in

order to plead protected activity. *Bonewitz*, 2015 WL 1825375, at *6; *see also*

*Jones-McNamara*, 630 F. App'x at 399 (explaining that "a plaintiff's activities

must reasonably embody 'efforts to stop' FCA violations"); *McKenzie*, 219 F.3d at

517 (explaining that plaintiff must establish "some nexus to the FCA"). Yet, Dr.

Fakorede's Complaint lacks any factual allegations that connect his alleged

concerns about Stark/Anti-Kickback violations to false claims submitted to the

Government.

The only mention in the Complaint of any relationship between Stark/Anti-

Kickback and the FCA is nothing more than a legal conclusion. Specifically, in

paragraphs 28 and 30 of the Complaint, Dr. Fakorede asserts as a general premise

that Medicare claims "tainted by" Stark/Anti-Kickback non-compliance constitute

FCA violations.  (*See* Compl., R.E. 1, PageID# 6, ¶¶ 28, 30.)  Yet, the Complaint never alleges that MSHC ever submitted any such "tainted" Medicare claims – or, for that matter, that MSHC billed any claims to government healthcare programs at all – much less that Dr. Fakorede engaged in any effort to stop such claims from being submitted.  Accordingly, Dr. Fakorede's non-factual, legal conclusions must be disregarded for purposes of a Rule 12(b)(6) analysis and, therefore, cannot save Dr. Fakorede's defective Complaint.  *Iqbal*, 556 U.S. at 678–79; *see also In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 903 (6th Cir. 2009) (explaining that legal conclusions unsupported by facts must be disregarded under the relevant standard of review).

Because the Complaint does not allege that MSHC submitted any false claims to the government or caused the Hospital to submit false claims, one is left to only speculate as to how Dr. Fakorede's alleged Stark/Anti-Kickback concerns might have related to supposed FCA violations.[2]  Such speculation is not permitted

---

[2]    MSHC does not dispute that violations of the Stark Law or Anti-Kickback Statute could – under certain circumstances not pled here – give rise to "false certification" liability under the FCA. *See, e.g.*, *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 467 (6th Cir. 2011).  As noted above, however, merely pleading a Stark/Anti-Kickback violation without connecting it to the submission of claims to the Government would not give rise to FCA liability.  This is particularly evident in the instant lawsuit where Dr. Fakorede did not allege that MSHC violated the substantive provisions of the FCA or made any false certifications.  Indeed, the phrase "false certification" does not appear anywhere in Dr. Fakorede's Appellant Brief or his brief with the district court.  The Complaint does not allege that MSHC made or intended to submit Medicare claims that contained expressly or impliedly

under the relevant standard of review. *See Farmer*, 2016 WL 3564386, at *2

("While the speculative connection [plaintiff] seeks to draw between his report . . .

and the eventual prevention of an FCA violation is perhaps possible, [plaintiff] has

alleged no facts making that attenuated connection plausible."). Rather, "[f]actual

allegations must be enough to raise a right to relief above the speculative level."

*Twombly*, 550 U.S. at 555. It is plaintiff's burden to plead facts that "state a claim

for relief that is plausible on its face." *Id.* at 544. It is not sufficient for Dr.

Fakorede to plead facts that are merely consistent with a § 3730(h) claim. *Iqbal*,

556 U.S. at 678. Because he failed to plead facts demonstrating a plausible claim

under the FCA's anti-retaliation provisions, his Complaint fails the *Twombly/Iqbal*

test.

---

false certifications. Nor does it allege that Dr. Fakorede acted with the intent to
stop false certification of Medicare claims. The Court would have to insert
additional facts into the Complaint in order to even consider a false certification
theory. While the Plaintiff is permitted reasonable inferences, it is not reasonable
to infer that Dr. Fakorede was acting to stop false certifications when there are no
factual allegations about any party submitting claims for payment to the
Government within the four corners of the Complaint, much less making
certifications about any such claims. That would require speculation about facts
not included in the Complaint and, therefore, cannot save his claim. *Twombly*, 550
U.S. at 555.

### C.   Dr. Fakorede Does Not Allege He Acted with the Belief MSHC Would Commit Fraud against the Government.

In order to allege protected activity, a plaintiff must allege a good faith belief that his "employer [was] committing fraud against the government."[3] *Jones-McNamara*, 630 F. App'x at 399-400 (internal quotation marks omitted, alternations added) (citing *Fanslow v. Chi. Mfg. Ctr., Inc.*, 384 F.3d 469, 480 (7th Cir. 2004); *Wilkins v. St. Louis Hous. Authority*, 314 F.3d 927, 933 (8th Cir. 2002); *Moore v. Cal. Inst. of Tech. Jet Propulsion Lab.*, 275 F.3d 838, 845 (9th Cir. 2002)).  In other words, the Complaint must allege that Dr. Fakorede acted with the requisite state of mind, which is a subjective belief he was acting to stop MSHC from submitting false claims for payment to the Government.

The Complaint never alleges that Dr. Fakorede actually held such a belief or that Dr. Fakorede intended to stop fraudulent claims from being submitted to the Government.  To the contrary, Dr. Fakorede asserts that he was acting to stop "believed fraudulent expenses to Jackson-Madison County General Hospital District, which were submitted in violation of the federal Stark Laws and the Anti-Kickback Statute."  (Appellant Br. at 20-21.)  That is not the same thing as a belief

---

[3]   Plaintiff must also allege his belief was reasonable.  *See Jones-McNamara*, 630 F. App'x at 399-400.  Here, the Court need not reach the question of reasonableness because Dr. Fakorede has not alleged that his conduct was actually motivated by a good faith belief that he was acting to stop a false claim from being submitted to the Government.

that MSHC was submitting false claims to the Government or causing the Hospital to submit false claims.

As the Sixth Circuit has explained, the terms "false" and "fraudulent" in the FCA have a very specific meaning, which is conduct "aimed to extract from the government money the government otherwise would not have paid." *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 467 (6th Cir. 2011) (citation and internal quotation marks omitted). The FCA does not proscribe false or fraudulent claims generally. Because the Complaint alleges only that Dr. Fakorede believed the Hospital was overpaying MSHC under the Recruiting Agreement, and he has not tied the Hospital's alleged payments with any payment by the Government, Dr. Fakorede failed to allege the subjective state of mind required to support a finding of protected activity under § 3730(h).[4] For this reason, too, his claim fails.

### D.    Dr. Fakorede Did Not Raise Stark/Anti-Kickback Concerns with MSHC Until after His Termination.

Even if mere Stark/Anti-Kickback concerns were protected under the FCA's anti-retaliation provision – which they are not – the factual allegations in the

---

[4]    In his Appellant Brief, Dr. Fakorede incorrectly presumes that "Mid-South's argument in support of its Motion to Dismiss appears to be that Dr. Fakorede did not allege a statement in which he used the precise word 'fraud.'" (Appellant Br. at 32-34.) That is not MSHC's argument. It is a strawman argument. The problem is not the absence of the word "fraud." The problem is the complete absence of any mention anywhere in the Complaint about concerns regarding submission of false claims to the Government – either with regard to Dr. Fakorede's statements to MSHC or in his subjective state of mind.

Complaint do not plausibly show that Dr. Fakorede's alleged conduct directed at MSHC was motivated by a belief of potential Stark/Anti-Kickback violations.

Although the Appellant Brief frequently conflates Dr. Fakorede's communications with the Hospital and his communications with MSHC, in reality, the Complaint identifies very little conduct by Dr. Fakorede to which MSHC employees were privy. As acknowledged in Dr. Fakorede's brief filed with the district court, there were only three instances, which he argued qualified as protected conduct, that the Complaint alleges MSHC was actually aware of. They are as follows:

> (1)    "Mid-South was on notice at least as early as January 9, 2015, when a representative of the Hospital emailed Mid-South's Practice Manager and its outside accountant—copying Dr. Fakorede—notifying them that Dr. Fakorede had 'raised some questions' about Mid-South's numbers and wanted Mid-South to provide more documentation."

> (2)    "Mid-South was put on further notice of Plaintiff's concerns on January 10, when Dr. Fakorede, in another email, explicitly challenged the expenses being attributed to him by Mid-South and told Mid-South that it needed to work with the Hospital to revisit those expenses that it was claiming."

> (3)    "Finally, just minutes before he was fired, Dr. Fakorede texted Mid-South CEO Dr. Cunningham and told Dr. Cunningham that he would not consider resigning while the audit was pending."

(Pl.'s Response Br., R.E. 25, PageID# 140, at 17 (citing Compl., R.E. 1, PageID# 12-13, 16, ¶¶ 66-67, 86).) None of these or any other actions described in the

Complaint constituted Stark/Anti-Kickback concerns that caused Dr. Fakorede's termination.

### 1.    Dr. Fakorede's Emails on January 9 and 10 Occurred before His Purported Stark/Anti-Kickback Concerns.

With respect to the first two instances, which occurred on January 9 and 10, the Complaint concedes that Dr. Fakorede did not have an actual belief that there were Stark/Anti-Kickback issues at that time.  Dr. Fakorede's brief with the district court explains the timing as follows:

> On January 10, 2015, Dr. Fakorede sent an email to Mid-South's practice manager, its accountant, and the Hospital's Finance Director. ([Compl.] ¶ 67).  In that email, Dr. Fakorede specifically noted that he had not used Mid-South's new office-based lab until a few days before the end of his first year, clearly implying that it was unreasonable to attribute more that $200,000 in depreciation expenses for that lab to him.  (*Id.*).  Mickey Hannon, Mid-South's accountant, refused to acknowledge that the expense was inappropriate.  Instead, he emailed back only to Hospital Finance Director Reeves **on January 12, 2015**, defending the calculations and the claimed expenses.  (*Id.* ¶ 68).  Ms. Reeves later forwarded that message to Dr. Fakorede when he asked if Mr. Hannon had ever responded.
>
> ***It was at this point that Dr. Fakorede truly became concerned that Mid-South was using him and his Recruiting Agreement to overstate expenses and mask unlawful payments from the Hospital.***  (*Id.* ¶ 66).

(Pl.'s Response Br., R.E. 25, PageID# 130, at 7 (emphasis added).)  Based on Dr. Fakorede's own timeline, he did not become concerned about alleged Stark/Anti-Kickback violations until *after* the January 9 and 10 emails in which MSHC's practice manager and accountant were carbon-copied.  Because the Complaint

26

concedes that Dr. Fakorede did not have concerns about Stark/Anti-Kickback violations until January 12, the "good faith belief" requirement cannot be satisfied with respect to the January 9 and 10 communications. *Jones-McNamara*, 630 F. App'x at 399-400.

### 2. Dr. Fakorede's February 11 Text Message Was Sent after His Termination.

With respect to the third instance, this could not have caused Dr. Fakorede's termination because he sent it after his employer informed him that he must resign or be fired. As explained below in section III, this could not have caused Dr. Fakorede's termination because it happened after he was informed of his termination. In any case, the message could not reasonably be interpreted as an effort to stop Stark/Anti-Kickback violations as it does not even generally reference concerns about regulatory compliance.

### 3. Other Conduct Raised in the Appellant Brief Was Directed at the Hospital, Not MSHC.

In addition to the three instances Dr. Fakorede relied upon in his brief with the district court, his Appellant Brief refers to additional communications between Dr. Fakorede and the Hospital that occurred between January 12, when his purported Stark/Anti-Kickback concerns arose, and February 10, when Dr. Fakorede was informed of his termination. As an initial matter, Dr. Fakorede waived this argument by failing to raise it with the district court.

Regardless, this new argument is unavailing.  First, the Appellant Brief mentions an email sent by Dr. Fakorede to the Hospital's Vice President on February 3, 2015.  (*See* Appellant Br. at 29.)  The Complaint does not allege that anyone from MSHC was copied or included on that email or that anyone from MSHC saw that email.  Instead, the Appellant Brief points to a vague statement by a Hospital employee that she had been "in conversation with everyone."  (*See* Appellant Br. at 30.)  While Dr. Fakorede's Complaint is entitled to favorable inferences, such a vague reference does not plausibly suggest that MSHC was somehow aware of Dr. Fakorede's email to the Hospital – much less that he was specifically complaining about Stark/Anti-Kickback violations or that those specific complaints were then relayed to MSHC.  Dr. Fakorede's argument basically asks the Court to make an inference upon an inference upon an inference and veers into the type of speculation proscribed by *Twombly*/*Iqbal*.

Second, the Appellant Brief suggests that the mere fact that the Hospital requested a refund – as specifically contemplated in the Recruiting Agreement – indicates that MSHC was somehow made aware that Dr. Fakorede had complained about Stark/Anti-Kickback compliance.  (*See* Appellant Br. at 30.)  This argument requires far too much speculation to satisfy the plausibility standard.  According to the Complaint, the only communications from Dr. Fakorede that MSHC had been privy to at this point were the January 9 and 10 emails, which do not even vaguely

refer to Stark or Anti-Kickback compliance and were made at a time when Dr. Fakorede himself concedes he was not concerned about such regulatory violations. It is too great a jump in logic to assume that the Hospital's request for a refund, which was specifically contemplated in the Recruiting Agreement, put MSHC on notice that Dr. Fakorede had been complaining about Stark/Anti-Kickback violations to the Hospital behind the scenes – particularly given that he had not raised such regulatory concerns with anyone at MSHC.  That argument too fails.

## III.    The District Court Correctly Held That Alleged Protective Activity Occurring After Termination Cannot Have Caused Termination.

The district court's holding with respect to the causation element should be affirmed.   The Complaint alleges that, immediately after Dr. Fakorede was terminated, he sent an email to Hospital employees that stated as follows:

> This decision to terminate my employment, of course, comes amidst the line audit of the financial report for year one of my employment that is currently underway which thus far has revealed a false $207,000 dollars which was in clear violation of the recruiting agreement (stating that the agreement is not to be used for the Clinic's financial benefit) and in violation of Stark Laws.

(Compl., R.E. 1, PageID# 17, ¶ 91.)

In its Order granting MSHC's motion to dismiss, the district court correctly held that, even assuming for the sake of argument that this email qualified as protected conduct, it could not have caused Dr. Fakorede's termination because it occurred after his termination.  (*See* Order, R.E. 34, PageID# 202-03, at 23-24.)

29

Dr. Fakorede's Appellant Brief argues reversible error while relying on this Court's statement that "'temporal proximity between the event is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation.'" (Appellant Br. at 41 (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)).)

The Appellant Brief entirely misses the point of this Court's precedent. It is assumed in this Court's case law discussing temporal proximity that the alleged protected conduct occurred *before* the termination, not after. Indeed, that was the fact pattern in each of the cases cited in the Appellant Brief. *See Mickey*, 516 F.3d at 523 (discussing an alleged "a causal connection between [plaintiff's] EEOC charge of discrimination filed on October 7, 2004, and his termination on October 19, 2004"); *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 435-36 (6th Cir. 2009) (explaining that plaintiff's termination "occur[ed] less than three months after his" alleged protected conduct); *Mikhaeil v. Walgreens Inc.*, No. 13-14107, 2015 WL 778179, at *9 (E.D. Mich. Feb. 24, 2015) ("Plaintiff testified that she made her report of Medicare fraud to Yadmark on June 28th, and Yadmark made the decision to terminate Plaintiff only two weeks later."). It is axiomatic that, in order for any event to cause a particular result, the event must occur before the result. The relevant pleading standard permits reasonable inferences, but an inference is not reasonable when it defies common sense.

30

Further, if the rule was otherwise, then any terminated employee could retroactively manufacture a lawsuit by immediately sending an email to his employer alleging complaints about FCA violations, gender or race discrimination, disability accommodations, etc.  Such a rule would set a terrible precedent that would essentially grant every terminated employee *carte blanche* to unilaterally set up a retaliation lawsuit regardless of what happened before he was terminated.  Thus, the district court's holding regarding causation must be affirmed.

## IV.   Alternatively, Dr. Fakorede Failed to Plead That MSHC Had Notice of What He Argues Was Protected Activity.

While the district court did not address the notice element one way or the other, this Court may affirm on the alternative grounds that the Complaint lacks sufficient factual allegations to plausibly show MSHC had notice of alleged protected activity.

### A.   The Complaint Contains No Allegations That Plausibly Show Notice of Any Efforts to Stop FCA Violations.

"'When seeking legal redress for retaliatory discharge under the FCA, plaintiff has the burden of pleading facts which would demonstrate that defendants had been put on notice that plaintiff was" engaged in efforts to stop submission of false claims for payment to the Government.  *Yuhasz*, 341 F.3d at 567 (quoting *United States ex. rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1522 (10th Cir. 1996)).  Dr. Fakorede's Complaint does not do so.

31

As explained above in section II, the Complaint does not allege that Dr. Fakorede acted to stop a false claim from payment from being submitted to the Government, much less put MSHC on notice of such actions. It does not allege that he accused MSHC or anyone else of violating or attempting to violate the FCA or commit any wrongdoing related to submitting claims to the Government. This is true both with respect to the few statements he made to MSHC representatives, and also as to the statements he made to the Hospital. The Complaint also does not allege that Dr. Fakorede raised Stark/Anti-Kickback concerns with MSHC, which – as explained above – is not protected activity in any regard. Thus, even if Dr. Fakorede had a subjective belief that he was acting to stop FCA violations (although the Complaint does not even allege that, as explained above), MSHC could not have reasonably interpreted his actions as motivated by a desire to stop false claims from being submitted to the Government.

### B.    Consideration of the Underlying Agreements Further Illustrates MSHC's Lack of Notice.

When considering the factual allegations of the Complaint along with the documents incorporated by reference into the Complaint,[5] the only reasonable explanation for Dr. Fakorede's alleged actions – from MSHC's perspective – was that Dr. Fakorede was acting to reduce his personal liability.

---

[5]    As the district court observed, Dr. Fakorede raised no objection to consideration of the Recruiting Agreement and Employment Agreement as part of a Rule 12(b)(6) standard of review. (Order, R.E. 34, PageID# 191, 12 n.5.)

Under the terms of the Recruiting Agreement, any "overage" paid under the practice support provisions would be refunded to the Hospital, if the amount withdrawn exceeded what was allowed in light of Dr. Fakorede's net collections, which were calculated by subtracting his expenses from his gross collections. (Ex. A, Recruiting Agreement, Sealed R.E. 18, page 10, ¶ 3(e).) In his Employment Agreement, MSHC agreed to indemnify Dr. Fakorede from any refund as a result of an "overage," but MSHC did not indemnify him for any other form of recoupment by the Hospital.[6] (*See* Ex. B Employment Agreement, Sealed R.E. 18, page 35-36, ¶ 27.) If Dr. Fakorede breached the Recruiting Agreement by leaving the service area before the end of the three-year term, which he ultimately did by moving to Mississippi (*see* Compl., R.E. 1, PageID# 19, ¶ 103), then he would be personally liable to refund the balance of all funds paid under the Recruiting Agreement, minus any refund requested by the Hospital as the result of an "overage" calculation. (*See* Ex. A, Recruiting Agreement, Sealed R.E. 18, page 9, ¶ 2(j).) Accordingly, Dr. Fakorede had a financial incentive to minimize expenses that MSHC attributed to him under the Recruiting Agreement because, the more

---

[6]    Dr. Fakorede's Appellant Brief incorrectly asserts that "Dr. Fakorede's concern was not a personal concern because Mid-South indemnified Dr. Fakorede for any overpayment that had to be returned to the District." (Appellant Brief at 14.) That claim is factually wrong as shown by the Employment Agreement, which states that MSHC would only indemnify against refunds requested as the result of an "overage" paid under the practice support provisions. (*See* Employment Agreement ¶ 27.) Dr. Fakorede would be personally liable for his breach for any amounts not refunded to the Hospital as the result of an "overage."

that the Hospital recouped from MSHC as the result of an "overage" refund, the less Dr. Fakorede would owe for breaching his Recruiting Agreement. (*See id.*)

With this context in mind, MSHC could not have reasonably viewed Dr. Fakorede's conduct as some sort of effort to stop false claims for payment to the Government. Rather, the only reasonable interpretation – from MSHC's perspective – was that Dr. Fakorede's questions about the expense reports were motivated by an attempt to reduce his personal liability to the Hospital under the Recruiting Agreement. Particularly when you consider that Dr. Fakorede did not express to MSHC any concerns about regulatory compliance (and certainly nothing about submitting false claims to the Government), it is not plausible that MSHC would have jumped to the unreasonable conclusion that Dr. Fakorede was taking efforts to stop FCA violations. *See Yuhasz*, 341 F.3d at 567 (explaining that a plaintiff must allege that he took actions beyond his normal obligations to "put defendants on notice . . . that [he] was" engaging protective conduct).

Viewing the totality of the factual allegations in the Complaint and documents incorporated therein, Dr. Fakorede has failed to plausibly allege the notice element of a § 3730(h) claim.

## V.    None of the Case Law Discussed in the Appellant Brief Undermines the District Court's Order.

Dr. Fakorede's Appellant Brief cites certain district court cases that he claims are factually analogous to his case. Those lower court cases are in no way

34

binding authority on this Court. In any case, they are either inapposite or illustrate why the district court in this case should be affirmed.

For example, Dr. Fakorede cites *Mikhaeil v. Walgreens, Inc.*, No. 13-14107, 2015 WL 778179 (E.D. Mich. Feb. 24 2015), for the proposition that an internal report may satisfy the protected activity and notice prong. (Appellant Br. at 39.) In *Mikhaeil*, unlike here, the plaintiff had specifically complained about a "potential instance of Medicare fraud," expressed concerns that "Medicare was billed twice for the same prescription," and made comments to her employer about "Medicaid or Medicare fraud." *Id.* at *4. In determining that this conduct qualified as protected activity, the *Mikhaeil* court emphasized that the plaintiff must "specifically allege fraudulent claims for federal funds and not merely address concerns about general misconduct" and that, even in light of the 2009 amendments to § 3730(h), "[t]here still must be some nexus between the report and exposing fraud." *Id.* at *7 (citations and internal quotation marks omitted). The *Mikhaeil* court then found that the plaintiff had a potential § 3730(h) claim only because she had specifically complained about Medicare fraud. As that court wrote, "[m]aking a report of potential Medicare fraud is . . . an internal report that alleges fraud on the government. That is protected activity under the FCA." *See id.* at *8. In stark contrast to the facts in *Mikhaeil*, Dr. Fakorede's Complaint

contains no allegation that he ever complained about potential Medicare fraud or any other type of false claim for payment to the Government.

Likewise, in both *Merritt v. Mountain Laurel Chalets, Inc.*, 96 F.Supp.3d 801, 811 (E.D. Tenn. 2015), and *Ickes v. Nexcare Health Systems, LLC*, No. 13-14260, 2016 WL 1275543 (E.D. Mich. Mar. 31, 2016), the plaintiff had clearly complained about fraud on the Government.   In *Merritt*, the plaintiff had complained about falsely paying an undocumented worker, which the court found "would amount to fraud against the United States government, and [plaintiff's] understanding of that is clear."  *Merritt*, 96 F.Supp.3d at 823.  In *Ickes*, the plaintiff had complained that "it is illegal under federal law to discharge [patients] when their source of payment changes to Medicaid," which is a program partially funded by the federal Government.   *Ickes*, 2016 WL 1275543, at *2.   In this case, however, Dr. Fakorede's Complaint contains no allegation that he complained about fraud against the Government or acted with the subjective intent to stop fraud against the Government.  Further, unlike here, the defendants in the *Merritt* and *Ickes* cases never raised the argument that the plaintiff has failed to plead complaints about fraud on the Government.

*Tibor v. Michigan Orthopaedic Institute*, 72 F. Supp. 3d 750 (E.D. Mich. 2014), is likewise inapposite.  In that case, the district court expressly declined to address the issue of whether plaintiff's alleged conduct constituted protected

activity under the "efforts to stop" prong of § 3730(h) because the defendant's motion in that case had "essentially ignored" the "efforts to stop" prong. *Id.* at 761 & n.4. In this case, however, whether Dr. Fakorede has properly alleged "efforts to stop" an FCA violation is a key issue on appeal. As such, Dr. Fakorede's reliance upon the *Tibor* case is unhelpful.

While Dr. Fakorede has failed to cite any controlling or persuasive authority that bolsters his argument, multiple cases support the district court's dismissal of his claim. In *Farmer*, 2016 WL 3564386, at *1, for example, the plaintiff argued that he had engaged in protected activity under the FCA by reporting an "incident of theft of government property from a warehouse operated by his employers." The district court held his complaint failed to allege protected activity under the FCA and granted defendants' motion to dismiss under Rule 12(b)(6). *Id.* The Fourth Circuit affirmed, explaining that the complaint lacked "any facts suggesting an underlying fraud" on the Government and, therefore, failed to plausibly state "an act 'in furtherance of an action under' the FCA or an 'effort[ ] to stop' an FCA violation." *Id.* at *2 (quoting § 3730(h)(1)). The *Farmer* court rejected the plaintiff's argument that "his report of the theft might have indirectly prevented future fraudulent deliveries to the government" because such a conclusion would require the court to make a "speculative connection" between his reported conduct and fraud on the Government. *Id.* While the Fourth Circuit acknowledged that

"the eventual prevention of an FCA violation is perhaps possible" as the result of plaintiff's alleged conduct, the plaintiff's complaint – like Dr. Fakorede's Complaint here – contained "no facts making that attenuated connection plausible." *Id.* (citing *Iqbal*, 556 U.S. at 678).

In *Johnson*, 2016 WL 873816, at *4, a plaintiff argued that she engaged in protected activity by sending two emails to her supervisors that raised concerns about her employer's business practices of "direct billing of Medicare–Medicaid patients." The district court found this conduct did not qualify as protected activity under § 3730(h)(1) because it did not involve stopping fraud on the Government, and the Fifth Circuit agreed. As the Fifth Circuit explained, while Medicare and Medicaid are Government-run programs, plaintiff "failed to demonstrate how her actions investigating this practice were in furtherance of uncovering or preventing fraud against the Government." *Id.* Although plaintiff "argued that her activity was protected under the FCA because the Government has an interest in the proper billing of their Medicare–Medicaid patients," her employer – like MSHC in this case – had not presented "any false claim for payment to the Government." *Id.* Here, too, Dr. Fakorede has failed to allege that he acted to prevent fraud against the Government.

In *Ziebell*, 806 F.3d 946, the plaintiff identified certain documents that she argued showed false or misleading certifications regarding regulatory compliance.

38

Like Dr. Fakorede, however, the plaintiff failed to explain how those documents related to claims for payment to the Government.  As such, the Seventh Circuit found that she had failed to "clearly articulate[] a false-claims theory of her case." *Id.* at 951.  The court observed that plaintiff's "false-certification theory runs into . . . trouble in that none of these documents has any apparent nexus to federal payments."  *Id.*  Accordingly, the *Ziebell* court rejected plaintiff's § 3730(h) claim, in part, because her complaints merely pertained to "regulatory noncompliance," not "fraudulent-claims activity."  *Id.* at 953.

In *Bonewitz*, 2015 WL 1825375, at *6, a district court rejected plaintiff's § 3730(h) claim because he had "never complained to anyone at [defendant-employer] . . . that any false claims were being generated and submitted by [defendant] or paid to [defendant] by the government."  The court observed that a plaintiff cannot establish that he was engaged in protected activity where he "never raised any concern (internally or externally) regarding the submission of actual false claims to the United States."  *Id.*  As the *Bonewitz* court explained, "complaints regarding actual false claims" are "the *sine qua non* of a viable FCA action."  *Bonewitz*, 2015 WL 1825375, at *6, n.7.  Here, like in *Bonewitz*, Dr. Fakorede's Complaint made no allegation about "complaints regarding actual false claims" being submitted by MSHC (or anyone else) and, therefore, he was "not engaged in protected activity."  *Id.*

39

Each of the above cases further supports district court's dismissal of Dr. Fakorede's § 3730(h) claim and demonstrates why that decision was in accord with the vast majority of courts to have addressed similar issues.

## <u>CONCLUSION</u>

For the foregoing reasons, MSHC respectfully requests that the Court affirm the district court's decision to dismiss Dr. Fakorede's claim.  In the alternative, the Court should affirm the district courts' decision on the grounds that Dr. Fakorede's Complaint fails to plausibly allege the notice element of his § 3730(h) claim.

Respectfully submitted,

BASS, BERRY & SIMS PLC

By: *s/ Brian D. Roark*

Brian D. Roark, Esq.
Brittain W. Sexton, Esq.
150 Third Avenue South
Suite 2800
Nashville, TN 37201

Todd D. Siroky, Esq.
Siroky Law, PLC
316 South Shannon Street
Jackson, TN 38302-1625

*Attorneys for Defendant-Appellee*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to the 6th Cir.R.32(a)(7)(C), the undersigned certifies this brief

complies with the type-volume limitations of 6th Cir.R.32(a)(7)(B).

1.    EXCLUSIVE OF THE EXEMPTED PORTIONS IN 6TH CIR.R.32(a)(7)(b), THE BRIEF CONTAINS:

    A.    9,994 words.

2.    THE BRIEF HAS BEEN PREPARED:

    B.    in proportionally spaced typeface using:

    Times New Roman, 14 font

3.    THE UNDERSIGNED UNDERSTANDS A MATERIAL MISREPRESENTATION IN COMPLETING THIS CERTIFICATE, OR CIRCUMVENTION OF THE TYPE-VOLUME LIMITS IN 6TH CIR.R.32(a)(7), MAY RESULT IN THE COURT'S STRIKING THE BRIEF AND IMPOSING SANCTIONS AGAINST THE PERSON SIGNING THE BRIEF.

*s/ Brian D. Roark*

41

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 9, 2016 the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users, or if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.


s/Brian D. Roark

**<u>DEFENDANT'S/APPELLEE'S DESIGNATION OF RELEVANT
DISTRICT COURT DOCUMENTS</u>**

| Docket No. | Page ID # Range | Description of Pleading |
|---|---|---|
| 1 | 1-2, 6, 8, 10-19 | Complaint |
| 18 | Sealed | Exs. A & B to Motion to Dismiss, Recruiting Agreement and Employment Agreement |
| 25 | 140, 130 | Plaintiff's Response to Motion to Dismiss |
| 34 | 191, 202-03 | Order Granting Motion to Dismiss |